706 P.2d 352

**In the Matter of a Member of the State Bar of Arizona,**

**George M. IRELAND, Respondent.**

**No. SB–297.**

Supreme Court of Arizona,
En Banc.

July 10, 1985.

Christopher W. Jensen, Prescott, for State Bar.

Monbleau, Vermeire & Turley by Kent E. Turley, Gust, Rosenfeld, Divelbess & Henderson by Richard A. Segal, Phoenix, for respondent.

PER CURIAM.

This matter involves a disciplinary proceeding against respondent, George M. Ireland, a member of the State Bar of Arizona, arising under the Code of Professional Responsibility Rule 29(a), Arizona Supreme Court Rules, 17A A.R.S.[1] On February 1, 1983, the Local Administrative Committee for District No. 1 of the State Bar of Arizona filed a five count complaint against Ireland alleging professional misconduct. Respondent filed objections to the complaint, and the Administrative Committee conducted hearings on the issues. The Administrative Committee dismissed Counts III and IV, but found that the allegations of misconduct charged in Counts I, II, and V were supported by the evidence. The Committee recommended that respondent be disbarred. The State Disciplinary Board affirmed the Committee's findings, but recommended that respondent not be disbarred but be suspended from the practice of law for a period of two years.

 In determining whether discipline is appropriate, we are guided by certain well-defined principles: (1) this court is the ultimate trier of both fact and law in disciplinary proceedings; (2) disciplinary violations must be established by clear and convincing evidence; and (3) the recommendation of the State Bar is entitled to serious consideration. *In re Moore*, 110 Ariz. 312, 313, 518 P.2d 562, 563 (1974). We proceed to address each count individually.

## COUNT I DOCKET NO. 82-3-1

Respondent is charged in Count I with several acts of impropriety in connection with his representation of Mrs. Dona Coch- ·

ran in a marriage dissolution proceeding. The most serious charge is respondent's alleged efforts to obtain a favorable spousal maintenance award for his client by misrepresenting her assets and liabilities to the court both in documentary evidence and by instructing his client to give false testimony. The Bar also charges that respondent charged Cochran unreasonable or excessive attorney's fees by separately charging her for the services of secretaries or other non-lawyer personnel when these fees were not agreed to by Cochran. The facts are highly contested.

Mrs. Cochran hired respondent in May 1980 to represent her in a marriage dissolution proceeding. On August 14, 1980, as payment for legal work rendered, Cochran tendered some silver coins to respondent. He accepted the coins, giving them a market value of $566.80, and issued a dated receipt to Mrs. Cochran in the amount of $566.80. These coins, part of a community property coin collection, form the basis of the Bar's charge that respondent misrepresented Cochran's assets and liabilities to the court. Specifically, the Bar contends that respondent informed Cochran that he would credit her account after the dissolution proceeding so that, in the interim, her liabilities would appear larger to the court. It is further alleged that respondent instructed Cochran, prior to a hearing on August 20, 1980 on pre-dissolution child support and spousal maintenance, to inform the court that the coin collection was sold for the necessities of life. We find these charges clearly substantiated by the evidence presented.

Respondent's records show that Cochran's account for attorney's fees was not credited until one year following respondent's receipt of the coins. We reject respondent's contention that he "forgot" to credit Cochran's account.[2]

1. Effective February 1, 1985, the Arizona Code of Professional Responsibility was replaced by the Rules of Professional Conduct. Pursuant to the order establishing the new disciplinary rules, all disciplinary matters pending before this Court or the State Bar of Arizona on February 1, 1985 in which a determination of probable cause has been made as of February 1, 1985 are governed by the disciplinary procedures in force and effect prior to February 1, 1985.

2. Throughout Count I the credibility of Cochran and respondent is directly in question. We rely

As to the Bar's charge that respondent suborned perjury, Cochran testified at the August 20 Order to Show Cause hearing about the disposition of the community property coin collection. On cross-examination by Mr. Cochran's attorney, Richard Walraven, Mrs. Cochran clearly misrepresented the status of the coin collection:

Q [Walraven] Do you have the coin collection?

A [Mrs. Cochran] Yes, I do.

Q Is it still—

A *Right where he left it.*

(August 20, 1980, Order to Show Cause Hearing, T.R. at 7) (emphasis added). Knowing Cochran's testimony to be false, respondent nonetheless permitted the court to be misled. Respondent was perfectly aware that the coin collection was not where Mr. Cochran had left it. Respondent was in possession of $566.80 worth of the coins as attorney's fees. Admittedly, Cochran did not testify that she sold the coins for the necessities of life. Nevertheless, respondent permitted the court to believe that the collection was intact, when, in fact, a portion had been transferred to respondent in satisfaction of attorney's fees.

▪ At another point during the August 20 hearing, respondent intentionally misled the court concerning Cochran's expenses and liabilities. The testimony elicited by respondent was being introduced to establish total expenses for the court's use in a maintenance and child support determination. Respondent examined Mrs. Cochran concerning her expenses covering the time period from May 5 to *August 11, 1980.* Mrs. Cochran correctly testified that she had paid attorney's fees through August 11

amounting to $695.90. The August 14 payment of $566.80, however, was not revealed by respondent. The Bar argues, and we agree, that respondent had a duty to reveal the $566.80 payment made six days prior to this hearing. The August 14 payment was clearly relevant to the court's determination, and respondent was under an obligation not to mislead the court through an intentional omission. *See In re Hubert,* 265 Ore. 27, 507 P.2d 1141 (1973) (disciplinary sanction imposed when attorney, in divorce proceeding, misrepresented to court amount of attorney's fees paid to date, and failed to disclose billing sent to client for an additional sum); *cf. In re Caffrey,* 63 Wash.2d 1, 385 P.2d 383 (1963) (attorney suspended after obtaining an order of default without disclosing to the court that a special appearance had been served on his office, and serving a copy of the order on opposing counsel knowing it had been wrongfully obtained); *Sullins v. State Bar,* 15 Cal.3d 609, 613, 542 P.2d 631, 632, 125 Cal.Rptr. 471, 472 (1975) (attorney reproved where he "withheld ... material facts bearing upon issues which were before the Court for decision").

▪ Respondent filed a contempt petition, dated November 19, 1980, on behalf of Mrs. Cochran, requesting the court to impose sanctions on Mr. Cochran for nonpayment of temporary maintenance. This petition included a statement that Mrs. Cochran had complied with an earlier court order to turn over the entire community property coin collection. The petition was intentionally misleading as respondent had in his possession the coins previously paid to him by Mrs. Cochran. In addition, respon-

on the findings of the Committee which was in a position to adjudge the demeanor of the witnesses:

18. One important consideration in the Committee's determination and findings with respect to Count One is that of the *credibility of the witnesses.*

\* \* \* \* \* \*

A judgment has to be made as to who is being truthful and honest and who is not. *In addition to the many clear, independent facts that were developed and corroborated in various ways, the credibility of Mrs. Cochran and her*

*sincere belief in the truthfulness of her testimony in the proceedings before the Committee were communicated repeatedly.*

\* \* \* \* \* \*

The Committee members were unanimous in their conclusion that, as between Mr. Ireland and Mrs. Cochran, *Mrs. Cochran was the one who was telling the truth.*
FINDINGS OF FACT AND RECOMMENDATION, LOCAL ADMINISTRATIVE COMMITTEE at 29, 32 (filed with the State Bar November 15, 1983) (emphasis added).

dent sent a letter to Judge Greer, dated December 22, 1980, which set forth Mrs. Cochran's suggested division of property. Attached to this letter was an entry which indicated that Mrs. Cochran had sold silver coins in the amount of $200. This entry indicates that respondent intentionally concealed information from the court about respondent's possession of $566.80 worth of coins from the coin collection.

DR 7-102 provides in pertinent part:

(A) In his representation of a client, a lawyer shall not:

\* \* \* \* \* \*

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

(4) Knowingly use perjured testimony or false evidence.

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

\* ¤ \* \* \* \*

Arizona Code of Professional Responsibility DR 7-102, Ariz.Sup.Ct.R., 17A A.R.S. Attorney candor and honesty form the bulwark of our judicial system. As is evidenced by the oath of admission each attorney must take prior to admission to the Arizona Bar, "[an attorney] will never seek to mislead the judge or jury by any artifice or false statement of fact or law[,]" the judicial system relies on the truthfulness of attorneys in their appearances before courts of law. The disciplinary rules give force to the general prohibition contained in the oath of office.[3] The evidence in this disciplinary action establishes that respondent purposely misrepresented his client's assets and liabilities before the superior court. In doing so, respondent transgressed the bounds of zealous representa-

tion of his client and violated the provisions of DR 7-102(A). Because of the necessity for reliance on attorney honesty, courts have not been reluctant to impose sanctions against a lack of candor toward the tribunal. *See Matter of James*, 452 A.2d 163 (D.C.1982) (two year suspension for misleading the court and commingling client funds); *Davis v. State Bar of California*, 33 Cal.3d 231, 655 P.2d 1276, 188 Cal.Rptr. 441 (1983) (three year suspension for, among other violations, wilful deception of the court); *cf. Matter of Nulle*, 127 Ariz. 299, 620 P.2d 214 (1980) (six month suspension for, among other things, counseling and facilitating filing of false liquor license application); *see generally*, Annot., 40 A.L. R.3d 169 (1971) ("Fabrication or Suppression of Evidence as Ground of Disciplinary Action Against Attorney.") In examining the evidence in this case we find that respondent engaged in a pattern of deception and misrepresentation to the superior court; the seriousness of respondent's actions warrants discipline.

The Bar also alleges that respondent charged Mrs. Cochran an "illegal or clearly excessive fee." This allegation stems from charges included in Mrs. Cochran's bill for secretarial services in contravention of a signed fee agreement. A fee agreement, dated May 9, 1980, and prepared by respondent, provided for a flat billing rate of $70 per hour. The agreement further provided for the reimbursement of costs advanced on the client's behalf. The Bar contends that *"charges for legal services, not including the services of licensed attorneys, which are not agreed to by the client, constitute unreasonable or excessive fees."* State Bar of Arizona's Answering Brief at 13. Respondent claims that "[w]hether or not it is common for a lawyer to make an extra charge for such services, there is no authority for a conclusion that it is unethical or illegal." Respondent's Opening Brief at 13. We disagree. DR 2-106 provides:

---

**3.** In addition to the Code of Professional Responsibility, Rule 29(b)(3), Ariz.Sup.Ct.R., 17A A.R.S. provides that any violation of the oath of office can suffice as grounds for disbarrment, suspension or censure.

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

Arizona Code of Professional Conduct DR 2–106, Ariz.Sup.Ct.R., 17A A.R.S. *In Matter of Burns*, 139 Ariz. 487, 679 P.2d 510 (1984), we construed this provision to apply "not only to excessive fees regardless of agreement, but to situations . . . when the fee charged is in excess of the fee agreed to by the parties." *Id.* at 491, 679 P.2d at 514. The fee agreement in the present case provided for a flat hourly billing rate without mention of billing for the services of secretaries. In the absence of an express agreement by the client to be charged separately for secretarial services, we find the fee charged in this case to violate DR 2–106(A).[4] *See id.* People v. Belfor, 200 Colo. 44, 611 P.2d 979 (1980) (discipline imposed for charging in excess of contingency fee agreement).

### COUNT II DOCKET NO. 82–6–1

█ Count II arises out of respondent's legal representation in the formation and operation of a closely-held Arizona corporation, Leroal Mining Company ("Leroal"). The Bar charges that a conflict of interests caused respondent to render incomplete legal advice to several of the Leroal incorporators, ultimately causing them to be defrauded out of their investment. It is also contended that this conflict prevented respondent from disclosing that funds from the account were used to satisfy the private debts of one of the incorporators. As in Count I, the facts are highly contested. We choose to focus on the most serious allegations. The Bar claims that respondent was retained in March 1981 by the *entire group* of Leroal incorporators, Hal LeRoy Fenison and Alfred and Roland Daniel [the "Daniel brothers"], for advice on the formation of an Arizona corporation. During a March 2, 1981 meeting of the group, respondent failed to inform the Daniel brothers that property which Fenison

would contribute to the corporation was at risk because it was the subject matter of pending litigation against Fenison. Respondent argues that he was representing Fenison in his personal capacity, not the broader group of incorporators, and therefore had no duty to inform the Daniel brothers. The evidence clearly shows otherwise. On March 1, 1981 respondent completed an internal "New Client/Matter Memo" listing the client as Leroal Mining Company. According to this document, respondent's attorney's fees were to be billed to Leroal. His duties as listed in the memo were preparation of a pre-incorporation agreement and the corporate documents. The evidence compels the conclusion that respondent was counselling the group, and not Fenison alone.

It is uncontested that respondent had been defending Fenison and his wife against claims by another group of investors [the "Becky Mines litigation"] involving the same property which was to form the assets of the new corporation. A "Notice of Lis Pendens" had been received by respondent's office in February 1981, on the 29 mining claims listed as assets in the Leroal pre-incorporation agreement.

On March 2, 1981 respondent met with Fenison and the Daniel brothers to discuss the formation of Leroal. As set forth in the pre-incorporation agreement, the Daniel brothers were to invest a total of $50,000 in the Leroal Company and receive 30% of the stock of the corporation. Each was to receive a seat on the Board of Directors. Fenison was to receive a 70% share for his contribution of mining property and equipment, and serve as President of the Company and also sit on the Board. The Bar maintains that although respondent was aware on March 2 that the assets which Fenison would transfer to Leroal were the subject of the Becky Mines litigation, respondent failed to make this disclosure to the Daniel brothers.

---

4. The question of whether separately billing the time of paralegals or messengers without express client agreement violates the disciplinary rule is not squarely presented by this case. We therefore decline to address it. Suffice it to say that it would be the better practice to have client agreement before such charges are billed.

The Bar also charges that on March 12 respondent met privately with Fenison and accepted delivery of a check written on the Leroal Mining corporate account for $11,166 which represented a $1,000 retainer fee for respondent's work on the incorporation, and $10,166 to be sent to Houston Mining for payment of a $10,000 personal obligation of Fenison's, plus accumulated interest. The Bar contends that respondent had a duty to disclose the release of these corporate funds to the Daniel brothers.

We find these charges substantiated by the evidence.

DR 5–105 provides in pertinent part:

(A) A lawyer shall decline proferred employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

Arizona Code of Professional Responsibility DR 5–105, Ariz.Sup.Ct.R., 17A A.R.S. The conflict of interests provisions of the disciplinary rules prohibits multiple representation when an attorney's independent judgment may be compromised. Ethical Consideration 5–18 discusses conflicts of interests when an attorney represents a corporation or a similar entity:

A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity *and not to a stockholder, director, officer, employee,* *representative, or other person connected with the entity.* In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present.

ABA, Model Code of Professional Responsibility EC 5–18 (1980) (emphasis added). In the present case, respondent's representation of Fenison adversely affected his representation of the entire group of incorporators of Leroal, which included the Daniel brothers. Rather than fully disclosing the existence of the Becky Mines litigation, which clearly put the Daniel brothers' investment at risk, respondent withheld the information, hoping the litigation would be resolved prior to formal incorporation. Respondent's Opening Brief at 35. Obviously, respondent was attempting to serve both Fenison and the other incorporators; this mistaken strategy eventually resulted in the Daniel brothers losing their $50,000 investment. Their loss was the subject of a malpractice action against respondent which was ultimately settled for an undisclosed amount.

With respect to the use of funds from the corporate account to pay Fenison's private debts, respondent was apparently so intimately involved with the private affairs of Fenison that he neglected his duty to the Daniel brothers. The funds, to be sent to the Houston Mining Company, were drawn on the corporate account, but were not used for the limited purposes set forth in the pre-incorporation agreement, i.e., to put Leroal into operation. Respondent was aware that these funds were being spent in satisfaction of Fenison's personal obligation.

The conflict of interests provisions of the disciplinary rules are designed to avoid precisely the kind of injury which occurred in Count II. Respondent should have fully disclosed his conflict pursuant to DR 5–105(C), or declined multiple representation.

Attorneys who undertake to represent parties with divergent interests owe the highest duty to each to make a full disclosure of all facts and circumstances which are necessary to enable the parties to make a fully informed decision regarding the subject matter of the litigation, including the areas of potential conflict and the possibility and desirability of seeking independent legal advice.

*Klemm v. Superior Court of Fresno County*, 75 Cal.App.3d 893, 901, 142 Cal. Rptr. 509, 514 (1977). By failing to disclose or decline representation, respondent's behavior warrants discipline. *Cf. Matter of Kali*, 116 Ariz. 285, 569 P.2d 227 (1977) (discipline warranted when attorney arranges loan between clients with adverse interests without revealing dual representation).

### COUNT V DOCKET NO. 82-9-1

■ In Count V, the Bar charges respondent with failing to act competently in handling the personal injury claim of Al and Elaine Sandri. The Sandris, residents of Arizona, were involved in an automobile accident in Needles, California with a California resident. Respondent was retained by the Sandris in April 1977, one month after the accident. Respondent waited, however, until May 1978 to file a complaint and then did so in the United States District Court for the District of Arizona. A default judgment was entered in November 1978. When a demand was made on defendant's insurance company, the company filed a motion to set aside the default and judgment on the grounds that there was no jurisdiction in Arizona and the California one year statute of limitations on personal injury actions barred suit. The district court set aside the judgment and dismissed the Sandris' complaint. Respondent admits negligence in his handling of the case, but

contends that disciplinary action is not warranted under the circumstances.

DR 6–101 provides:

(A) A lawyer shall not:

\* \* \* \* \* \*

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him.

Arizona Code of Professional Responsibility DR 6–101, Ariz.Sup.Ct.R., 17A A.R.S. Researching a question of jurisdiction and the applicable statute of limitations in a personal injury action of this nature is so rudimentary to the practice of law as to warrant no further comment. We disagree with respondent, however, that such behavior is not actionable under the disciplinary rules. *See, e.g., Matter of Egan*, 127 Ariz. 105, 618 P.2d 599 (1980) (neglect of personal injury defense and incorporation warrants one year suspension); *Matter of Haggard*, 123 Ariz. 27, 597 P.2d 180 (1979) (six month suspension for inadequate preparation, and misrepresentation to client). In addition to respondent's negligence, we are concerned with his apparent lack of candor before the Local Administrative Committee regarding what transpired with the Sandris following dismissal of their suit in district court. Respondent claimed before the Committee that he advised the Sandris by letter of the district court's dismissal, and suggested a meeting to further discuss the matter. He advised the Committee that his intention was to suggest that the Sandris file a claim against his malpractice carrier. Respondent claimed that the Sandris never contacted him. The Sandris vehemently denied this to the Committee, and claimed that they met with respondent and that he advised them that they had gotten "shot out of the saddle" and would have a difficult time collecting. No suggestion was made for them to contact respondent's malpractice carrier. We note that the Sandris have evidently never been compensated for their injuries.

More serious than respondent's negligence in handling the Sandris' suit was his

misrepresentation to his client. DR 1–102(A)(4) prohibits attorney "dishonesty, fraud, deceit, or misrepresentation." This court has previously imposed disciplinary sanctions for similar conduct. *See Matter of Haggard,* 123 Ariz. at 29, 597 P.2d at 182.

## IMPROPRIETY BY LAC MEMBER

█ In addition to contesting the State Bar's factual allegations, respondent claims that his disciplinary proceeding was prejudiced when David Babbitt, a member of the Committee, privately dined, on two occasions, with Alfred Daniel, a primary witness before the Committee on Count II. On the first occasion, Babbitt apparently asked Mr. Daniel to dinner following his first day of testimony, as neither had dinner plans and each was staying at the same motel in Prescott. They also met at breakfast the next morning. Regardless of the motive for the private meetings between Babbitt and Daniel, we find such conduct by a member of the Committee improper. The Local Administrative Committee acts as a quasi-judicial body. Any private meeting of a witness and committee member, *whether or not anything of substance transpired between them,* calls into serious question the impartiality of the body. Were we convinced that the disciplinary proceedings were discussed, a new hearing might be necessary. We are convinced, however, that respondent suffered no prejudice, based upon the sworn statements by Babbitt, Daniel, and other members of the Committee. Both Babbitt and Daniel claim to have engaged only in small talk, with the disciplinary action never being discussed. These statements are corroborated by Evelyn Fosteson, court reporter for the State Bar, who had dinner at a table nearby to Daniel and Babbitt and who was included in some of their conversation. In addition, Raymond Brown, the Acting Chairman of the Local Administrative Committee, in his affidavit, stated that the decision reached by the Committee was unanimous as to Count II, that Babbitt did not attempt to influence the Committee based on any private conversation held with Daniel, and that in his opinion there was no evidence that Babbitt was influenced by any contacts he may have had. While there was no prejudice to respondent, we condemn the actions of the Committee member in this instance.

## CONCLUSION

The Disciplinary Board has recommended that respondent be suspended for a period of two years. This court is cognizant of the seriousness of suspension as a disciplinary alternative. We are also aware of respondent's repeated impropriety. His type of behavior can seriously undermine public confidence in the legal profession. The most serious charge is respondent's wilful deception of the superior court. Such activity erodes the foundation of the judicial system. As to the other counts, the evidence establishes that respondent permitted a conflict of interests to interfere with his obligation to adequately counsel his client. In another instance, respondent failed to adequately prepare a simple legal matter to his clients' grave detriment. The significant breaches of the disciplinary rules shown in this record fully support the imposition of a two year suspension.

It is therefore ordered that respondent, George M. Ireland, be suspended from the practice of law in this state for two years commencing upon the issuance of this court's mandate. It is further ordered that respondent pay costs in the sum of $9,300.89 pursuant to Rule 37(g), Ariz.Sup. Ct.R., 17A A.R.S. Respondent is directed to comply with the provisions of Rule 37(h), Ariz.Sup.Ct.R., 17A A.R.S.

HOLOHAN, C.J., GORDON, V.C.J., HAYS, J., and ROBERT J. CORCORAN and BRUCE MEYERSON, Court of Appeals Judges, concur.

CAMERON and FELDMAN, JJ., did not participate in the determination of this matter. ROBERT J. CORCORAN and BRUCE MEYERSON, Court of Appeals Judges, Division One, were called to sit in their stead.