887 P.2d 541

L. Kent SMITH, M.D. and Jane Doe
Smith, husband and wife, et al.,
Petitioners,

v.

Hon. Robert D. MYERS, Judge of the Su-
perior Court of the State of Arizona, in
and for the county of Maricopa, Respon-
dent,

Martha B.T. BELLINA, individually and
as surviving spouse of Philip Vincent
Bellina, Jr., M.D., decedent, et al., Real
Parties in Interest.

No. CV–92–0069–PR.

Supreme Court of Arizona.

Dec. 29, 1994.

Broening Oberg & Woods by James R. Broening, Cynthia V. Cheney, Daniel A. Zanon, and Neal B. Thomas, Phoenix, for defendants/petitioners.

Haralson, Kinerk & Morey, P.C. by Burton J. Kinerk, Dale Haralson, and Kenneth Lee, Tucson, for real parties in interest.

Lewis & Roca by Alexandra M. Shafer, John P. Frank, and Roger W. Kaufman, and Jones, Skelton & Hochuli by William R. Jones, Jr., Phoenix, for amici Mutual Ins. Co. of Arizona and Arizona Hospital Ass'n.

Snell & Wilmer by Barry D. Halpern and Thea Foglietta Silverstein, Phoenix, for amicus Arizona Medical Ass'n.

Goldman & Kaplan, Ltd. by Alan Goldman and David D. White, Phoenix, for amicus Evelyn Touchette.

Langerman Law Offices, P.A. by Amy G. Langerman, Phoenix, and Robert J. Stephan, Jr., P.C. by Robert J. Stephan, Jr., Phoenix, and Galligan & Conlin, P.C. by Roxanne Barton Conlin, Des Moines, IA, and Association of Trial Lawyers of America by Jeffery R. White, Associate Gen. Counsel, Washington, DC, for amici Arizona Trial Lawyers Ass'n and Ass'n of Trial Lawyers of America.

Ulrich, Thompson & Kessler by Paul G. Ulrich and Nancy C. Thompson, Phoenix, for amicus Truck Ins. Exchange.

## OPINION

ZLAKET, Justice.

This case requires us to rule on the constitutionality of Arizona's periodic payment statutes, A.R.S. §§ 12–581 to –594.[1] Plaintiffs (real parties in interest) filed a wrongful death action alleging medical malpractice. Defendants (petitioners) elected to have the case tried under the statutes in question, which provide for the periodic payment of future economic losses. Plaintiffs objected, claiming there was "good cause" for not employing this method of compensation. *See* A.R.S. § 12–582. That objection was overruled.

Plaintiffs also raised constitutional challenges, which were sustained by the trial judge. The court of appeals accepted special action jurisdiction and granted relief to the defense. *Smith v. Superior Court,* 171 Ariz. 511, 831 P.2d 1279 (Ct.App.1991). On review, we vacate the appellate court's opinion and hold that the periodic payment statutes violate article 2, section 31 of the Arizona Constitution by limiting medical malpractice victims to a significantly less valuable remedy than would otherwise be available. We

have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## THE PERIODIC PAYMENT STATUTES

Personal injury and wrongful death damages have traditionally been awarded in a "lump sum" at the conclusion of trial. Dan B. Dobbs, 2 *Law of Remedies* § 8.5(5), at 479 (2d ed. 1993). Such an award typically includes compensation for losses incurred prior to trial, as well as those expected to subsequently accrue. *Id.* Future economic damages are generally reduced to present value. *Id.* § 8.5(1), at 461. Thus, the successful plaintiff receives a sum that, if invested at a reasonable interest rate, should provide enough money to cover expenses that may eventually arise. *Id.*

Under this payment method, tort victims have immediate access to the full amount of their awards, provided judgment debtors have sufficient assets with which to satisfy them. Except in cases involving minority or other disability, courts have properly considered the victims' use of these lump sums to be their own business. *See Kansas Malpractice Victims Coalition v. Bell,* 243 Kan. 333, 351, 757 P.2d 251, 263 (1988). Recipients have neither been required to invest nor to account for the money to anyone, much less to those who caused their injuries in the first place. *See id.* Simply put, funds acquired as compensation for losses precipitated at the hands of tortfeasors have become the immediate property of tort victims to do with as they see fit. *See Carson v. Maurer,* 120 N.H. 925, 944, 424 A.2d 825, 838 (1980).

Since the mid–1970s, however, a number of states have adopted laws granting tortfeasors and their insurers an alternative method of paying damage awards. *See* Roger C. Henderson, *Designing a Responsible Periodic–Payment System for Tort Awards: Arizona Enacts a Prototype,* 32 Ariz.L.Rev. 21, 27 (1990). Under these "periodic payment" schemes, future damages are theoretically paid to injured plaintiffs when they

---

1. These statutes have been renumbered as §§ 12–2601 to –2614 (effective 1993). Our opinion today refers to their original designations.

accrue. *See id.* at 26. Thus, instead of receiving immediately-available lump sums that include compensation for anticipated economic losses, plaintiffs are awarded judgments specifying the amount they are entitled to receive each succeeding week, month, or year to cover that period's expected damages. *See, e.g.,* A.R.S. § 12–586(C).

In 1989, Arizona enacted its own periodic payment legislation, applicable only to medical malpractice cases. 1989 Ariz.Sess.Laws Ch. 289, § 2 (codified at A.R.S. §§ 12–581 to –594). These statutes were adopted after a governor's task force made various suggestions to counter increases in medical malpractice insurance rates. Recommendations of Task Force on Medical Malpractice Insurance 5–6 (March 10, 1989). This advisory group specifically cautioned, however, that the adoption of a periodic payment system could have state constitutional implications. *Id.*

## DISCUSSION

■ As part of the Arizona Constitution's Declaration of Rights, article 2, section 31 provides that "[n]o law shall be enacted in this State limiting the amount of damages to be recovered for causing the death or injury of any person." This prohibition applies to wrongful death cases. *Halenar v. Superior Court,* 109 Ariz. 27, 29, 504 P.2d 928, 930 (1972) ("[I]f the right to sue is granted, by § 31 of Article 2 the legislature cannot place a limitation upon the recovery...."). It represents a "fundamental guarant[y] to the people of Arizona," intended "to have broad sweep to protect all injured persons." *Kenyon v. Hammer,* 142 Ariz. 69, 80 n. 9, 688 P.2d 961, 972 n. 9 (1984). In this regard, "the Arizona Constitution is almost unique in its provisions regarding tort law." *Id.* at 79, 688 P.2d at 971. Thus, although courts in some other jurisdictions have upheld periodic payment statutes against constitutional attack, *see, e.g., American Bank & Trust Co. v. Community Hosp.,* 36 Cal.3d 359, 204 Cal.

Rptr. 671, 683 P.2d 670 (1984); *Bernier v. Burris,* 113 Ill.2d 219, 100 Ill.Dec. 585, 497 N.E.2d 763 (1986), we cannot ignore this extraordinary protection carved out by Arizona's founding fathers and jealously guarded by its citizens.[2]

■ Under Arizona's periodic payment scheme, either party in a medical malpractice action may elect to have the case tried under these statutes. A.R.S. § 12–582(A). Such an election is effective unless the non-moving party can demonstrate, by clear and convincing evidence, good cause not to invoke the law. A.R.S. §§ 12–582(C), 12–583. Once the statutes are applied, a successful plaintiff receives a lump sum for all past damages and future non-economic damages. A.R.S. § 12–586(C). Other anticipated items, such as medical expenses and lost wages, are paid in periodic installments according to a schedule delineating the amount of economic loss the trier of fact expects plaintiff to incur. *See id.* Defendants, their liability carriers, or both, must provide funding for these future payments. A.R.S. § 12–587(A)–(B). They may purchase annuity contracts from "qualified insurers,"[3] A.R.S. §§ 12–581(8), 12–588(A)(1), or can bind themselves to make payments when due if they meet the statutory requirements. *See* A.R.S. § 12–588(A)(2). Either way, plaintiff receives a promise to pay in the future instead of a lump sum award.

■ Because the full amount of an annuity is not presently available for a beneficiary's use, it has less immediate worth than a lump sum. *See* Samuel A. Rea, Jr., *Lump–Sum Versus Periodic Damage Awards,* 10 J.Legal Stud. 131, 147 (1981). In addition to this shortcoming, an annuity carries risks that further lessen the value of its structured payout. The most serious of these is that the obligor may face insolvency before the plaintiff recovers all sums to which he or she is entitled. "[C]ontinued payment is subject to the defendants' continued economic viabili-

---

**2.** Arizona voters, on more than one occasion, have firmly rejected attempts by various interest groups to eliminate this constitutional guaranty, most recently in the general election of November 8, 1994.

**3.** A qualified insurer is one that meets the minimum financial standards established by statute and any other requirements imposed by the director of the department of insurance. A.R.S. § 12–593(C).

ty—a risk that the plaintiff need not suffer under the lump-sum system." W. John Thomas, *The Medical Malpractice "Crisis": A Critical Examination of a Public Debate,* 65 Temp.L.Rev. 459, 515 (1992); *see also* John Jefferies, *Structured Settlement Security: Reality or Facade?,* Trial, Aug. 1991, at 26, 26. Recently, a number of insurance companies have encountered serious financial difficulties. Some have failed, leaving those who depended on them struggling with unpaid bills and seemingly endless debts. *See, e.g.,* House Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce, 101st Cong., 2d Sess., *Failed Promises—Insurance Company Insolvencies* (Comm. Print 1990) (examining causes); Francine L. Semaya, *Insurer Insolvency— Where We Are Today,* in *Law and Practice of Insurance Company Insolvency Revisited* 2, 2 (1989) (noting that "[t]here have been numerous insolvencies in the past, but never with the social and financial impact of the last several years"); Justin Blum, *Bankruptcy Leaves Comatose Student Uninsured,* Wash. Post, June 23, 1993, at D1; Dana Priest, *In W.Va., an Insurance Safety Net Unravels—Failure of Blue Cross Leaves a Trail of Destitution in Small Town,* Wash. Post, Aug. 3, 1992, at A1. Defendants argue that the periodic payment statutes safeguard against this danger by requiring annuity companies to have a certain degree of financial stability before the court can approve funding. *See* A.R.S. § 12–593(C). Even if an insurer meets statutory qualifications, however, there can be no guaranty of future economic health. The largest and strongest financial institutions may in the long run become insolvent. Joseph Kelner & Robert S. Kelner, *Life Insurance Industry Stability and Tort Litigators,* N.Y.L.J., Jan. 10, 1990,

at 3. *See also, e.g.,* Albert B. Crenshaw, *Taxpayers Pay for Failed Insurers, Hill Told—Insurance Companies Bear Only 14 Percent of Costs, Two Separate Studies Contend,* Wash. Post, Apr. 29, 1992, at A20; Bill Montague, *Policyholders Caught in Executive Life's Wake,* U.S.A. Today, Apr. 15, 1991, at 4B; *Insurer in Big Failure Seeks Court Protection,* Ariz. Republic, May 14, 1991, at B11 (describing the largest life-insurance failure in U.S. history). Moreover, "[u]nlike customers at banks and savings and loan institutions, people who trust their money to life insurance companies are not protected by a federal bailout mechanism." Kelner & Kelner, *supra,* at 3 (*citing* Forbes, July 10, 1989, at 38).

Arizonans are not insulated from this risk. A 1992 study warned that the state could lose more than $60 million in revenues over the ensuing several years because of insurance company failures. Crenshaw, *supra.* Indeed, recent newspaper accounts have reported that an insurer relied on by the Arizona Lottery could be facing bankruptcy, with the result that past winners might never see their millions. *See, e.g.,* Ed Foster, *Shaky Insurer Owes Lottery Winners Millions,* Ariz. Republic, Sept. 15, 1994, at A1. According to such reports, the company is in "hazardous health" and has been ordered to stop doing business in Arizona. *Id.* Thus, both recent history and good sense teach us that no commercial institution, not even a large insurance company that today appears financially strong, is immune from the uncertainties of the marketplace. Despite the legislature's good faith attempts to minimize the dangers of financial collapse and resulting loss to beneficiaries, the risks are still present.[4]

4. It is one thing for a plaintiff in a tort action to voluntarily agree upon a "structured settlement" that includes future periodic payments or the purchase of an annuity. Such person has an opportunity to accept or reject the risks associated with the arrangement. It is a far different thing to impose these risks upon a tort victim who would otherwise decline them. As the Kansas Supreme Court has stated:

> While a plaintiff may certainly agree to accept his judgment in the form of an annuity ..., the concept of forcing him to accept an annuity limits his remedy. His payout may take years

and ... there is always the risk of default, however slight. Lump-sum payments do not carry such risks.

*Kansas Malpractice Victims Coalition,* 243 Kan. at 351, 757 P.2d at 263. *See also,* Philip H. Corboy, *Structured Injustice: Compulsory Periodic Payment of Judgments,* 66 A.B.A. J. 1524, 1524–25 (1980) (arguing that it is "coercive" to impose periodic payments on plaintiffs who would not otherwise accept them, and that "victims should be free to choose their own investments and to alter them to optimize their

■ The problem is compounded ·by the fact that, in the event of a default, malpractice victims have little recourse. Once funding is provided and approved by the court, judgment debtors are discharged and their liability insurance carriers are deemed to have satisfied the obligation to pay damages. A.R.S. § 12–587(F). The victims' only remedy may be against insolvent payment obligors. *See* A.R.S. § 12–587(D). *See also* Kelner & Kelner, *supra*, at 4 (advising attorneys that when clients *voluntarily* enter into structured settlements, they should obtain multiple guarantees to guard against the risk that the annuity provider may become insolvent). In such circumstances, those who are dependent on periodic payments may face severe and unavoidable financial consequences.

The statutory response to such a scenario is the requirement that qualified annuity providers be licensed in states having guaranty funds of at least $100,000. *See* A.R.S. § 12–593(C)(3). This qualification, however, is not likely to adequately protect those who will most often be subject to the statutes, i.e., plaintiffs whose damages exceed $100,000. *See* A.R.S. § 12–583(A)(2) (court may find good cause not to try a case under the statutes if future damages are too small to warrant periodic payments); Henderson, *supra*, at 40–41 (many periodic payment statutes apply only in cases where damages exceed a monetary threshold, usually $100,000 to $250,000).

Noting a risk of uncollectability in every case, defendants and the court of appeals rely on the following language from *Ruth v. Industrial Commission*, 107 Ariz. 572, 576, 490 P.2d 828, 832 (1971): "It is our opinion that the constitutional provision [prohibiting damages recovery limitations, Ariz. Const. art. 18, § 6,] was meant only to maximize the injured party's potential for recovering his entire damages, not to insure its recoverability." *See Smith*, 171 Ariz. at 515, 831 P.2d at 1283. Such reliance is misplaced. The above statement was not directed at the con-

stitutional clause we now consider, and in any case should not be taken out of context. In *Ruth*, petitioners sued various third-party tortfeasors after having also elected to receive workers' compensation benefits. 107 Ariz. at 573, 490 P.2d at 829. The Industrial Commission claimed a statutory lien on petitioners' recoveries to the extent of payments it had made to them. We rejected an argument that the lien represented an unconstitutional limitation on the amount of damages recovered, noting that petitioners ended up receiving the full amount to which they were entitled for injuries sustained. "Therefore," we said, "there is actually no limitation on the amount of [the] recovery by suit—only a reimbursement to the Commission for the compensation and accident benefits advanced." *Id.* at 576, 490 P.2d at 832.

The facts in *Ruth* bear no similarity to the matter now before us. Furthermore, the periodic payment statutes can hardly be viewed as consistent with the constitutional goal of "maximiz[ing] the injured party's potential for recovering his entire damages," *id.*, when they add another layer of risk to that which is already present.[5]

These laws also effectively limit recovery by depriving victims of flexibility in meeting unpredictable expenses.

> [T]he money represented by the judgment becomes the plaintiff's property when he obtains a judgment. Yet [under a periodic payment system], he is denied the right to dispose of that property, as and when he pleases.

*Carson*, 120 N.H. at 944, 424 A.2d at 838 (holding periodic payment statute unconstitutional as a violation of equal protection). This may result in significant disadvantages. For example, if a jury expects a plaintiff to incur an unusually large medical expense at some point in the future, it may award appropriate compensation. A.R.S. § 12–584(B). The plaintiff, however, is not entitled to receive the money until the year in which the jury believed the loss would be suffered.

chances for an adequate return, just as others do").

5. While it is always possible that a defendant may have insufficient assets or insurance with

which to satisfy any judgment, in the case of periodic payments there exists the additional risk of insolvency on the part of the annuity company or other obligor.

Should the expense occur earlier, the plaintiff may lack funds to cover it. *See* James F. Blumstein et. al., *Beyond Tort Reform: Developing Better Tools for Assessing Damages for Personal Injury*, 8 Yale J. on Reg. 171, 189 (1991) (recognizing that periodic payments do "not account for unforeseen changes in a victim's health status associated with the original tort").

■ The court of appeals acknowledged this problem, but decided it was obviated by the trial court's retention of jurisdiction to oversee the payment of judgments. *Smith*, 171 Ariz. at 515, 831 P.2d at 1283. According to the appellate court, the judge should be able to order payment of damages in advance of the period for which they have been awarded. *Id.* Nowhere, however, do the periodic payment statutes explicitly grant such power. Moreover, even if the laws could be interpreted to allow a plaintiff to petition for early disbursement of funds, this approach would likely be too expensive and time-consuming to meet immediate needs. It seems obvious that annuity companies would aggressively resist any alteration of their contracts without the assessment of substantial monetary penalties against the beneficiaries. Additionally, permitting such modifications would do little to further the goal of finality in litigation.

These statutes limit damages in yet another way. Should an injured medical malpractice victim die earlier than the jury predicted, payments cease in some instances even if the total judgment has not been satisfied. *See* A.R.S. § 12–590. Similarly, when a beneficiary in a wrongful death case dies, his or her portion of the award goes to the other beneficiaries. *See* A.R.S. § 12–590(B). If there are none, all payments stop. *Id.* These significant departures from the way damages have been awarded in the past signal clear reductions in the size of potential recoveries.

Defendants argue that such results are appropriate because victims should not receive payment for harm not yet suffered. Damages, they say, should compensate only

for actual loss. *See* Dobbs, *supra*, § 3.1, at 281. The argument is fallacious. Because a judgment is satisfied over time does not mean the recipient suffers loss proportional to and on the same time schedule as the periodic payments. Fact-finders have no crystal ball. Thus, any award for future damages can only be a reasonable guess, "a convenient but imperfect estimate of the value or cost of purchasing services necessitated by the original tort." Blumstein et al., *supra*, at 190.

■ When a court or jury attempts to determine how long a claimant will live and sets a value on future economic loss, *see* A.R.S. § 12–584(A)–(B),[6] it does not necessarily follow that actual damages are lessened if he or she dies earlier than anticipated. Correspondingly, if death occurs later than predicted, the law does not require a tortfeasor, his insurer, or the annuity company to suffer an increase in the amount of the earlier judgment. When any estimate of future loss proves to be incorrect, common wisdom and sound public policy dictate that the error should inure to the benefit of the tort victim rather than the tortfeasor. Yet, the periodic payment statutes would seem to be working in the opposite direction. *See* Philip H. Corboy, *Structured Injustice: Compulsory Periodic Payment of Judgments*, 66 A.B.A. J. 1524, 1526 (1980) (arguing, with reference to the Model Periodic Payments of Judgments Act, that it is "unconscionable" for such a statute to primarily benefit the "person whose culpable conduct generated the lawsuit or the person who insures the culpable party and so stands in his place for this purpose").

■ Defendants claim that by declaring the periodic payment statutes unconstitutional we contradict our holding in *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977). We disagree. *Eastin* established that juries may consider plaintiffs' collateral benefits in determining damages. *Id.* at 585, 570 P.2d at 753. We decided that such evidence informs fact finders of the true extent of plaintiffs' economic loss and discourages

---

6. *Compare* A.R.S. § 12–584(C), which allows the jury to award future medical costs based not on claimant's estimated lifespan but rather on the continuing need for health care during the remainder of his or her lifetime, however long that may be.

windfalls. *Id.* In a very real sense, therefore, *Eastin* supports today's holding. Permitting payments to be terminated on the demise of injured victims or wrongful death beneficiaries bestows upon tortfeasors and their insurance carriers significant economic benefits, neither earned nor bargained for, that would simply not be available under the traditional lump sum system. Furthermore, in *Eastin* we noted that

> admission into evidence of plaintiffs' collateral benefits in no way guarantees any reduction in the damages awarded by the trier of fact. The jury may still choose to ignore the collateral benefits in making its decision as to the damages sustained by the plaintiffs.

Once the court decides to apply periodic payment laws, however, jurors are not free to disregard them in awarding damages.

The plaintiffs make two additional arguments. First, they assert that the statutes in question violate Ariz. Const. art. 18, § 6, which also contains a prohibition against limits on damage recoveries. Second, they argue that these laws are contrary to the equal protection clauses of both the state and federal constitutions. Although the court of appeals considered these issues, because we vacate its opinion and find that article 2, § 31 provides sufficient basis for our decision today, we do not address them.

## CONCLUSION

■ A promise of future installment payments is not the equivalent of a lump sum award. We therefore hold that Arizona's periodic payment scheme is effectively a damage limitation prohibited by Ariz. Const. art. 2, § 31. The opinion of the court of appeals is vacated, and the trial court's ruling is affirmed. The case is remanded for further proceedings consistent with this opinion.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN and MARTONE, JJ., concur.