898 P.2d 975

**In the Matter of a Member of the State Bar of Arizona, Robert Edward FEE, Respondent.**

**In the Matter of a Member of the State Bar of Arizona, John Marc MONTIJO, Respondent.**

Nos. SB–93–0024–D, SB–93–0025–D. Disc. Comm. Nos. 91–0388, 91–0389.

Supreme Court of Arizona.

July 6, 1995.

Slutes, Sakrison, Even, Grant & Pelander, P.C. by Tom Slutes, Tucson, for respondents.

Allen B. Shayo, Phoenix, for State Bar of Arizona.

## OPINION

ZLAKET, Justice.

Because these bar disciplinary proceedings arise out of the same facts, they are consolidated for decision. We have jurisdiction pursuant to Rule 53(e), Ariz.R.Sup.Ct.

Respondents' client gave birth to a severely brain-damaged boy. In 1987, after unsuccessfully seeking representation from three other attorneys, she retained respondents on a 40% contingent fee. They filed a medical malpractice suit against the State of Arizona and Pima County on behalf of both mother and son. The child's claim was dismissed, as was a pending conservatorship, after the trial court determined that *Pizano ex rel. Walker v. Mart*[1] precluded all but the mother's action for losses and expenses relating to the boy's condition.

The medical negligence claim was admittedly weak. Respondents' success in developing a colorable racketeering theory, however, prompted negotiations. After an unproductive initial settlement conference, a second was scheduled for January 21, 1991, the day before trial. On Friday the 18th, the defense offered a structured settlement consisting of a cash lump sum followed by periodic payments. This proposal designated a separate amount for attorneys' fees. After consulting an annuities expert, respondents and their client decided that her needs would likely be greater than those contemplated by the offer.

The following Monday at 3:30 P.M., the parties, attorneys, and annuities experts met with the settlement judge. In a private conference with respondents' group, the judge brought up the latest proposal. This prompted a discussion about the "common defense tactic" of making separate offers of attorneys' fees. Respondents and the judge agreed that such a move frequently had the effect of "driving a wedge" between a plaintiff's lawyer and his or her client by causing fees to become a source of discomfort, disagreement, and potential conflict.[2] Despite his recognition of this strategy, however, and respondents' argument that the reasonableness of their fee was an issue for the trial court at the conclusion of the case,[3] the settlement judge indicated that, in his opinion, the contingent fee being charged here was excessive. Testimony before the disciplinary hearing committee shows that the relationship between the court and respondents deteriorated from that point and became progressively antagonistic over this issue. The judge allegedly raised his voice and cursed at respondents. He threatened that if the case did not settle, he would advise the trial judge the failure was because of respondents' greed. All of these statements were made in the presence of the client.

Respondents asserted at the disciplinary hearing that during these negotiations they spoke with their client about the insufficiency of the attorneys' fees being offered by the defense. They claimed that she authorized them to demand more money for the care of her son, thereby possibly securing an increase in fees as well. Although he was not technically a party to these proceedings, the record shows that the son's interests were important to all participants, particularly the court. Consequently, following respondents' pleas, the judge agreed to seek more money from the defendants.

■ Late in the day, the settlement judge called both sides into the courtroom to discuss a new offer, consisting of $175,000 in cash, annuities for both mother and son, $400,000 in attorneys' fees, and $55,000 in costs. According to the judge, this offer was

---

1. 164 Ariz. 37, 790 P.2d 735 (1990) (holding that child born with defects has no cause of action for "wrongful life" against a physician who negligently failed to provide information that might have provoked the mother to terminate her pregnancy).

2. Indeed, the defense here has since acknowledged that this was its purpose in making a separate offer of fees.

3. *See* Rule 3, Uniform Medical Malpractice Rules.

higher than the previous one because of respondents' representations that the client needed, among other things, better housing and "specially equipped transportation" for her son, as well as additional funds for his possible future surgeries.

After conferring briefly, respondents met privately with the client and proposed that she pay them an additional $85,000 in attorney's fees from her share of the cash proceeds.[4] During this discussion, the judge approached the trio and asked if they needed his help. Respondent Fee testified that he felt pressured by the judge's presence and told him, "I don't want you here." Fee also told the client that she should not allow herself to feel coerced by her attorneys or the judge and that she could refuse the offer or take additional time to consider it.

After repeatedly advising the client of her right to seek independent advice and obtaining numerous assurances from her that she was satisfied with the arrangement, Fee prepared a handwritten agreement concerning the additional fees. This document included a "confidentiality provision," which the committee found was for the client's protection[5] and "to maintain the confidential nature of the settlement conference." Committee Report at 8 (Oct. 22, 1992).

The three then returned to the courtroom where respondents informed their annuities expert about the new agreement. They asked the expert to review the proposed settlement with the client one final time to ensure that the available funds would be sufficient to meet her needs and that the overall agreement was fair. After meeting for approximately ten minutes outside respondents' presence, the expert became satisfied that the client understood and agreed

to the terms. The client then signed the additional fee agreement and returned to the judge's chambers with her attorneys.

Respondent Fee announced that they agreed "in principle" to the settlement. However, when the judge repeated the terms previously discussed, nobody disclosed the existence of the newly-enacted fee agreement. Both the committee and the commission found that respondents, not wanting to upset the settlement and believing it was not this judge's role to determine reasonableness of fees, planned to reveal the separate agreement to the trial judge in connection with the formal approval of attorneys' fees required by Rule 3, Uniform Medical Malpractice Rules.[6] The lawyers never got the chance to do so.

Ten days after the conference, the client telephoned the settlement judge, informed him of the separate agreement, and asked whether she was required to comply with it. The judge obtained a copy of the agreement, held a hearing during which he removed respondents from the case, appointed pro bono counsel to complete the settlement, and provided for the proceeds to be relayed through the clerk of the court for "proper" distribution. He then initiated these disciplinary proceedings.

The hearing committee found that respondents violated ER 3.3(a)(1) (candor toward a tribunal) and ER 8.4(c) (conduct involving a knowing misrepresentation and causing an adverse or potentially adverse effect on a legal proceeding). It recommended 30–day suspensions. A majority of the disciplinary commission found an additional violation of ER 8.4(d) (conduct prejudicial to the administration of justice) and recommended 60–day suspensions.[7] The state bar asks this court

---

4. Respondents testified that according to their calculations at the time, receipt of these additional funds would have left them with a total fee amounting to only 34% of the structured package's present value. We have calculated that the final fee percentage was higher than that, but still slightly less than the 40% originally agreed upon by the client. In any event, neither the committee nor the commission found that the fee charged was excessive.

5. Apparently, the client had often told respondents that she did not wish family or friends to know the amount of any recovery.

6. The record also shows that, within hours of the conference, respondents discussed what they had done with other practitioners and retired judges, all of whom reportedly agreed that their conduct had been proper.

7. Two commissioners dissented, finding the recommended penalty overly harsh for what they considered a technical violation.

to disregard both recommendations and impose six-month suspensions.

We agree that respondents breached ER 3.3(a)(1), which states: "A lawyer shall not knowingly ... make a false statement of material fact or law to a tribunal." Rule 42, Ariz.R.Sup.Ct. The comments to ER 3.3 state that "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." *See also In re Ireland,* 146 Ariz. 340, 342, 706 P.2d 352, 354 (1985). Respondents knowingly failed to disclose the separate agreement to the settlement judge in violation of this rule. At the same time, they engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation" in violation of ER 8.4(c).[8]

There are remarkably few cases applying the rules of professional conduct in a settlement context and none that we find directly on point. *See, e.g., Blackwell v. Department of Offender Rehabilitation,* 807 F.2d 914, 915–16 (11th Cir.1987) (upholding sanctions against attorney for seeking fees that were foreclosed by settlement); *Virzi v. Grand Trunk Warehouse & Cold Storage Co.,* 571 F.Supp. 507, 512 (E.D.Mich.1983) (holding that zealous representation does not justify withholding essential information, such as death of the client, in settlement); *Kath v. Western Media, Inc.,* 684 P.2d 98, 101 (Wyo. 1984) (setting aside settlement because counsel failed to disclose knowledge of false evidence). The bulk of ethical rules seem to have been designed with litigation scenarios in mind. *See* Rex R. Perschbacher, *Regulating Lawyers' Negotiations,* 27 Ariz.L.Rev. 75, 76–77 (1985). Nevertheless, the scope of their applicability to settlement discussions has been the subject of frequent scholarly debate. *See, e.g.,* Gary L. Stuart, *The Ethical Trial Lawyer* 319–21 (1994); Thomas F. Guernsey, *Truthfulness in Negotiation,* 17 U.Rich.L.Rev. 99 (1982); Geoffrey C. Hazard, Jr., *The Lawyer's Obligation to be Trustworthy when Dealing with Opposing Parties,* 33 S.C.L.Rev. 181 (1981); Perschbacher, *supra;* Walter W. Steele, Jr., *Decep-*

*tive Negotiating and High–Toned Morality,* 39 Vand.L.Rev. 1387 (1986); Alvin B. Rubin, *A Causerie on Lawyers' Ethics in Negotiation,* 35 La.L.Rev. 577 (1975); James J. White, *Machiavelli and the Bar: Ethical Limitations on Lying in Negotiation,* 1980 Am.B.Found.Res.J. 926.

A few commentators have even gone so far as to question the wisdom of demanding truthfulness in settlement conferences, suggesting that a certain amount of gamesmanship is considered acceptable. *See, e.g.,* Geoffrey M. Peters, *The Use of Lies in Negotiation,* 48 Ohio St.L.J. 1 (1987). As one author notes, "[t]he operational necessities of the bargaining process yield an ethical 'functionalism' that results in the minimal truthfulness and fairness necessary for an agreement." Eleanor H. Norton, *Bargaining and the Ethic of Process,* 64 N.Y.U.L.Rev. 493, 493 (1989). Although this court is by no means naive to the realities of the marketplace, we are unwilling to accept or endorse such a flimsy ethical standard. It is not unreasonable to expect more from members of the bar, and we do.

Early drafts of the Model Rules of Professional Conduct contained a separate section devoted to settlement negotiations. It was, however, deleted from the final version. *See* Perschbacher, *supra* at 77–78 n. 10. There also appear to be few formal guidelines for judicial officers acting as mediators, which may serve to explain their occasional use of inappropriate techniques. Daisy H. Floyd, *Can the Judge Do That?—The Need for a Clearer Judicial Role in Settlement,* 26 Ariz. St.L.J. 45, 50 (1994). "[B]ecause of a 'judicial zeal for settlement,' the increased opportunity for abuse may lead to judges punishing parties and lawyers who fail to cooperate in settlement." *Id.* at 49.

Thus, misguided strategies believed to be endemic to the bargaining process and the lack of clearly-defined roles for settlement judges may, regrettably, combine to create an environment ripe for occurrences such as

---

8. Although we agree with the commission that respondents' conduct may technically have violated ER 8.4(d), this "catch-all" provision adds little or nothing to our analysis. Because the other rules are the primary ones at issue here, we limit our discussion to them.

this.[9] The commission found that ambiguities in these areas played a significant role in the misconduct at issue. Also contributing were circumstances peculiar to this case. The hour was late, and trial was scheduled to begin the following morning. The judge, although deservedly recognized as a seasoned and fair mediator, became somewhat adversarial on this particular day. He not only allowed defense counsel to "drive a wedge" but may unwittingly have assisted them in doing so. Respondents did not want to lose a favorable settlement for their client. At the same time, they neither wished to permit the defense to dictate the amount of their fees, nor felt comfortable with pressure from the judge to reduce them. Moreover, respondents clearly attempted to ensure that their client fully understood and concurred in the separate agreement. Both the committee and commission specifically found that the modification was fair and that the client understood it. The uncontradicted evidence also suggests that respondents thought they were not obligated to disclose the arrangement to the settlement judge.

■ Nevertheless, we cannot condone their conduct. In our judgment, respondents should have either disclosed the complete arrangement or politely declined any discussion of fees. Fear that this might have jeopardized the settlement, while understandable, does not excuse their lack of candor with the tribunal. The system cannot function as intended if attorneys, sworn officers of the court, can lie to or mislead judges in the guise of serving their clients. "Zealous advocacy" has limits. It clearly does not justify ethical breaches.

9. Although the conduct of defense counsel is not at issue here, respondents point out that they also were not forthcoming about their ultimate settlement authority when questioned by the judge.

10. A majority of the commission concluded that suspension was necessary because the additional hearing and the judge's removal of respondents from this case caused "an adverse or potentially adverse effect on the legal proceeding." *See* Standard 6.12, American Bar Association *Standards for Imposing Lawyer Sanctions* (1991). Both actions, however, were initiated by the offended settlement judge, who believed that respondents had engaged in severe professional,

We note that neither the committee nor the commission found any aggravating factors. Both, however, cited numerous mitigating circumstances, including the absence of prior disciplinary records, lack of dishonest or selfish motives, full and free disclosures to the disciplinary authorities, and cooperative attitudes throughout these proceedings. The committee also found that respondents "demonstrated a high level of competence in their representation" of this plaintiff. Committee Report at 17.

■ Although we adopt the factual findings of both the committee and the commission, we are compelled to agree with the dissenting commissioners that the recommended sanction "exceeds the misconduct." Commission Report at 15 (Mar. 11, 1993).[10] The goal of discipline is to protect the public, not to punish lawyers. *In re Coffey*, 171 Ariz. 544, 546, 832 P.2d 197, 199 (1992); *In re Kastensmith*, 101 Ariz. 291, 294, 419 P.2d 75, 78 (1966). Nothing in the record suggests that respondents pose any threat to the public. Moreover, they already have suffered a considerable penalty by virtue of the extensive negative publicity surrounding this case.[11]

■ We wish to discourage the previously-described tactic of "driving a wedge" between lawyer and client in negotiations. Although nothing in our ethical rules expressly prohibits separate offers of attorneys' fees, we agree with the New York City Bar ethics committee that they frequently pose a serious dilemma for lawyers. *New York City Bar Association Committee on Professional Ethics*, formal op. 80–94.[12] Quite simply,

and possibly criminal, misconduct. We also note the absence of any finding that respondents' actions caused "injury or potential injury to a party to the legal proceeding." *See* Standard 6.12, *supra*. Thus, under these specific facts, we disagree that suspension is required.

11. Although the hearing committee decided that media reports may have caused injury to the legal system, it also found that the publicity was not caused by respondents and was, in fact, shunned by them.

12. Even though the New York City bar committee was condemning the use of such settlement offers in civil rights and liberties cases as being

such offers are often intended to place attorneys in the uncomfortable position where they may be caught between their own need to be compensated for legal services and what might otherwise be in their clients' best interests. We therefore urge judges to carefully scrutinize attempts to employ this practice.

■ Moreover, although it is certainly not forbidden for a judge to raise the topic of attorneys' fees during settlement discussions, we believe it unwise and unfair to focus on the fees of one party without corresponding inquiry into those of the other.[13] With such a selective approach, the judge may easily overstep his or her bounds. An attorney on the receiving end of this type of treatment should be entitled to some measure of self-protection. We have indicated that a more appropriate reply here was for respondents to have politely but firmly declined to discuss their fees. We concede that, considering the level of tension evident in this conference, such a response may have destroyed any chance of settlement. Nevertheless, a good end does not justify deceitful means.

The dissent deserves a brief response. First, it reaches factual conclusions that are diametrically opposed to those of the committee, the commission, and the majority of this court. Second, in positing "4 things [that] might have happened" if respondents had later "disclosed their side fee agreement to the trial judge and opposing counsel," the dissent completely ignores the possibility that the trial judge might have approved the fees after reviewing the matter in detail and applying the factors set out in ER 1.5(a). Neither the committee nor the commission concluded that the fees were unfair. Moreover, because the issue has not properly been presented to us and there are no findings made by a trial court, which is where the inquiry properly belongs in the first instance,

see Rule 3, Uniform Medical Malpractice Rules, the record contains little information from which we can independently determine the overall reasonableness of the fees.

Additionally, the dissent's criticism of the "terms of respondents' fee agreement" simply has nothing to do with the issues presently before us. We also note that it fails to even mention the fact that, according to both the committee and the commission, the client knowingly and voluntarily entered into the contract.

■ In conclusion, we hold that respondents violated their duties of candor and truthfulness pursuant to ER 3.3(a)(1) and ER 8.4(c) and censure them for their conduct. Rule 52(a)(4), Ariz.R.Sup.Ct. We emphasize that a judge acting as mediator is still a judge to whom the ethical duty of candor is owed.

Pursuant to Rule 52(a)(8), Ariz.R.Sup.Ct., each respondent is assessed costs in the amount of $1,922.91.

FELDMAN, C.J., MOELLER, V.C.J., and MARTONE, J., concur.

CORCORAN, Justice, dissenting:

I respectfully dissent.

I view the facts in this case differently from the majority. The respondents Fee and Montijo lied to the settlement judge so that they would get more money and their client would get less money. It is especially egregious for a lawyer to lie to a judge for the purpose of increasing his own fees at the direct expense of his client. I cannot agree with the committee, the commission, and the majority that respondents lacked dishonest or selfish motives. *Res ipsa loquitur.* Such conduct warrants at least a suspension and not a mere censure.

---

in conflict with the congressional goal of promoting enforcement of these laws, we agree with counsel for respondents that these tactics could have a similar chilling effect in the personal injury arena.

**13.** Rule 3, Uniform Medical Malpractice Rules, makes it the court's duty to evaluate the reasonableness of both sides' fees according to the

factors set forth in ER 1.5 and *In re Swartz,* 141 Ariz. 266, 686 P.2d 1236 (1984). Thus, a settlement judge's inquiry into only one side's fees and use of them as a "bargaining chip" may give an unfair advantage to the opponent. If, however, a judge believes that any fee is clearly excessive, he or she has an obligation to report the matter to the state bar.

Respondents allege that they intended to reveal their side fee agreement to the trial judge. *See* Rule 3, Uniform Rules of Practice for Medical Malpractice Cases (requiring attorneys for all parties to submit their fees for court approval and requiring plaintiff's attorney to disclose client's net recovery). However, this assertion does not ring true. If respondents had disclosed their side fee agreement to the trial judge and opposing counsel, which would have required admitting that they had lied to the settlement judge, 4 things might have happened: (1) the trial judge could have refused to honor the side agreement; (2) the trial judge could have referred the matter back to the settlement judge who possessed the most information about the case; (3) defendants' attorneys could have sought to enforce the settlement agreement as communicated to the settlement judge; or (4) defendants' attorneys could have sought to withdraw their settlement offer. Any one of these events would have ruined respondents' scheme to collect attorneys' fees in excess of those communicated to the settlement judge. In addition, all parties who became aware of the secret fee agreement would have been required to report respondents' misconduct to the state bar. *See* ER 8.3(a), Arizona Rules of Professional Conduct; Canon 3(D)(2), Arizona Code of Judicial Conduct; Robert J. Corcoran, *In re Himmel: Am I My Brother's Keeper?*, Ariz. Att'y, Oct. 1989, at 15. In fact, when the settlement judge learned of respondents' misconduct, he filed a complaint with the state bar, pursuant to Canon 3(D)(2).

I agree with the majority that: (1) "[t]he bulk of ethical rules seem to have been designed with litigation scenarios in mind," and (2) there are "few formal guidelines for judicial officers acting as mediators." That, however, does not excuse the misconduct here. For lawyers dealing with judges, whether they be trial or settlement judges, the guiding rule is never lie to or mislead a judge. *See* ER 3.3, Arizona Rules of Professional Conduct. Respondents claim that they were lying in order to secure the best settlement agreement for their client. Nonetheless, it is often the case that lawyers who lie *for* the client will also lie *to* the client.

I also emphasize that the terms of respondents' fee agreement in conjunction with the secret side agreement would have resulted in respondents receiving an overwhelmingly disproportionate share of the client's up-front cash payment. The client signed three fee agreements dated October 29, 1986, January 29, 1987, and December 19, 1989. Only the last fee agreement addressed the possibility of a structured settlement. It provided that "[i]n the event this case is settled by way of a structured settlement ... the attorney's fees will be computed on the basis of a percentage of the present value of the settlement. The attorney's fees will be paid out of the initial cash payment(s)." If respondents had successfully recovered $485,000 in attorneys' fees payable from the initial cash payment, as contemplated by the side fee agreement, they would have received 84% of the client's up-front cash recovery (excluding the $55,000 designated as costs). Furthermore, by collecting their fees from the up-front cash payment, respondents left the client to bear all the risk that the annuity provider would become insolvent. *See Smith v. Myers*, 181 Ariz. 11, 14–15, 887 P.2d 541, 544–45 (1994). A less onerous fee agreement is one in which the plaintiff's attorney collects his fees only if, as, and when the plaintiff receives the funds. *See* Comment, *Timing Payments of Attorney's Fees in Structured Settlements: Avoiding Problems with the "When Received" Approach*, 24 Willamette L.Rev. 993, 1006–09 (1988); *cf. Carter v. Industrial Comm'n*, 182 Ariz. 128, 130–31, 893 P.2d 1291, 1293–94 (1995). Under an "if, as, and when received" fee arrangement, respondents would only have been entitled to 40% of the client's up-front cash recovery, or $230,000.

For the above reasons, I agree with the hearing committee, the disciplinary commission, and state bar counsel that respondents Fee and Montijo should be suspended.