960 P.2d 47

Timothy J. HMIELEWSKI, Esq., Richard A. Alcorn, Esq., and Steven Feola, Esq., Attorneys–Appellants,

v.

MARICOPA COUNTY, a political subdivision of the State of Arizona, Real Party in Interest-Appellee.

No. 1 CA–CV 96–0421.

Court of Appeals of Arizona, Division 1, Department D.

Aug. 21, 1997.

Redesignated as Opinion and Publication Ordered May 4, 1998.

**2**

Timothy J. Hmielewski, pro. per., Fort Lauderdale, FL.

Steven Feola, pro. per., Phoenix.

Richard A. Alcorn, pro. per., Phoenix.

Romley, Maricopa County Attorney by Jessica Gifford Funkhouser, Deputy County Attorney, Phoenix, for Real Party in Interest–Appellee.

GARBARINO, Judge.

¶ 1   The attorneys for the plaintiffs and a defendant in the underlying medical malpractice action appeal from sanctions imposed against them for conducting what the trial court characterized as a secret "sham" trial. We conclude that the trial court did not abuse its discretion and affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2   This appeal arises out of a medical malpractice action.   Cheryl Anne Newcomb was admitted to Scottsdale Memorial Hospi-

tal for inducement of labor to deliver her first child.   Mrs. Newcomb suffered complications, including massive bleeding, from which she died following the birth of the child.   The child, Caroline, was born with severe brain damage.

¶ 3   Cheryl's husband, Thomas W. Newcomb, and Caroline (the Newcombs) sued Scottsdale Memorial Health Services, Inc. d/b/a Scottsdale Memorial Hospital–Osborn (SMH), Dr. James R. Bair, Cheryl's obstetrician, and his professional corporation.   They alleged that because of the position of the placenta and large fibroids in the womb, defendants should have performed a Cesarean section (C-section) instead of inducing labor.   Defendants took the position that both the placenta and fibroids were near the top of the uterus so there was no reason to plan to deliver by C-section.   They maintain that Mrs. Newcomb died as the result of an amniotic fluid embolism, a very rare and natural consequence of the birth process.   The autopsy concluded that the cause of death was amniotic fluid embolism.

¶ 4   The trial court granted summary judgment in favor of SMH.   The remaining defendants, Dr. Bair and his professional corporation, proceeded to trial defending against allegations of fraud, falsification of medical records, and negligence.

¶ 5   Rodney G. Johnson of Phoenix and Timothy J. Hmielewski, a Florida attorney who was granted permission to practice *pro hac vice* in the Maricopa County Superior Court, represented the Newcombs.   Prior to the grant of summary judgment but after the discovery deadline, they discovered evidence which led them to believe they could prove SMH falsified records to avoid liability for Mrs. Newcomb's death and Caroline's injury. However, because the court had granted summary judgment in favor of SMH, they were unable to use the evidence.

¶ 6   While a motion for new trial concerning the summary judgment was pending, the case against Dr. Bair went to trial.   Dr. Bair did not have professional liability insurance coverage for the lawsuit because his insurance carrier had become insolvent shortly before the occurrence involving the Newcombs.

¶ 7 Prior to the trial, the attorneys for the Newcombs and for Dr. Bair entered into an agreement proposed initially by Hmielewski. Because Dr. Bair did not have malpractice insurance nor the financial assets to compensate the Newcombs for their catastrophic damages, the Newcombs agreed not to levy or execute against Dr. Bair or his professional corporation. In exchange, Dr. Bair's attorneys agreed not to object to the scope or form of any inquiry the Newcombs' attorneys conducted at trial, the evidence or the witnesses. The agreement was to be effective only if it remained confidential.

¶ 8 The final agreement was contained in a letter from Richard A. Alcorn, an attorney for Dr. Bair, to Hmielewski which was signed by both of them. Pursuant to the agreement, the Newcombs agreed to provide a covenant not to levy or execute against the assets of Dr. Bair or his professional corporation. It was further agreed that, at the close of the Newcombs' case, the Newcombs would voluntarily dismiss with prejudice the action against Dr. Bair and his corporation.

¶ 9 The parties did not inform the trial court of their agreement, and the case proceeded to trial. In addition to Alcorn, attorney Steven Feola appeared for Dr. Bair. On January 4, 1996, the jury was chosen and counsel made their opening statements. During the next eight days, Hmielewski and Johnson presented the Newcombs' case to the jury. Dr. Bair's attorneys cross-examined the Newcombs' witnesses and called one expert witness of their own out of order.

¶ 10 At trial on January 22, 1996, the Newcombs' attorneys moved for a mistrial. They argued that testimony showed that false statements had been made by witnesses in depositions and at trial and that if the trial proceeded to judgment, the Newcombs might be barred by collateral estoppel from further proceedings and actions against SMH and others. When the court indicated that it would deny the motion for a mistrial, Hmielewski stated that his clients would dismiss their case against Dr. Bair. The court allowed the attorneys time to reach an agreement, the case against Dr. Bair and his professional corporation was dismissed, and the court announced to the jury that the case had been settled.

¶ 11 The trial court first learned of the attorneys' pretrial agreement on February 12, 1996, during oral argument on the motion for new trial on the summary judgment it had granted in favor of SMH. An attorney for SMH had heard of the agreement from another lawyer and revealed it to the court. The trial court ordered the four attorneys involved to provide the court with statements concerning the terms and implementation of the agreement. After receiving the written statements, the court held a sanctions hearing during which the attorneys were allowed to make oral statements concerning their justification for the pretrial agreement. The court found:

> The lawyers involved duped the Court into conducting a mock trial at the taxpayers expense to serve their own ends. Because of that fraud on the Court at least the following wrongful acts occurred. Nine citizens of this county were ordered by the Court to set aside nine working days of their lives at $12.00 a day, minus parking, so that they could serve as props in a charade. This judge, the Court staff, and the facilities of this division, were occupied for over two weeks to further a devious private purpose, thus robbing legitimate litigants of what it is this Court is here to do. Lawyers, as officers of the Court, abused their licenses and ordered persons to be witnesses, coercing their presence by the illegitimate invocation of the contempt power of this Court. This judge was even induced to order that a non party produce a witness who did not wish to play in the game.

The court ruled that the conduct of the attorneys was contrary to Rule 41(c), the preamble to Rule 42, and E.R. 3.3, E.R. 8.4(c), and E.R. 8.4(d) of Rule 42, Rules of the Arizona Supreme Court.

¶ 12 Hmielewski, Johnson, Alcorn, and Feola were each ordered to pay $15,000 to the clerk of the superior court as sanctions "for wrongfully expropriating for their own aims the resources of the Court." The court also revoked the order granting permission for Hmielewski to practice *pro hac vice* in

**4**

the court. Hmielewski, Alcorn, and Feola appealed from the order imposing sanctions.

## DISCUSSION

### I. *Authority to Impose Sanctions*

▮ ¶ 13 Like a review of sanctions imposed under Rule 11, Arizona Rules of Civil Procedure, we review sanctions levied under other authority using an abuse of discretion standard. *See Precision Components, Inc. v. Harrison, Harper, Christian & Dichter, P.C.,* 179 Ariz. 552, 557, 880 P.2d 1098, 1103 (App.1993) (imposition of sanctions under disciplinary rule and court's inherent powers to sanction attorney misconduct was within sound judicial discretion of trial court); *James, Cooke & Hobson, Inc. v. Lake Havasu Plumbing & Fire Protection,* 177 Ariz. 316, 319, 868 P.2d 329, 332 (App.1993) (appellate court should review all aspects of Rule 11 sanctions under abuse of discretion standard).

▮ ¶ 14 The trial court has the inherent power to sanction bad faith conduct during litigation independent of the authority granted by Rule 11. *Precision Components,* 179 Ariz. at 555, 880 P.2d at 1101, (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 49, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). These powers are governed by " 'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " *Id.* (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). The rules of conduct for attorneys contained in the Rules of the Arizona Supreme Court also provide a legal basis for imposition of sanctions against attorneys. *See id.* The trial court had the legal authority to impose sanctions for attorney misconduct.

### II. *Sanctions Against Hmielewski*

¶ 15 Hmielewski argues on appeal that the sanctions against him are unjustified because he took what he believed was the best course of action to reduce trial time, while enhancing the primary goal of establishing the truth of why Cheryl Newcomb died and how her baby suffered brain damage. He maintains that he properly balanced his duty as an advocate to zealously assert his client's position against the need for full and frank disclosure to the court. Hmielewski does not challenge the amount of the sanction.

▮ ¶ 16 Citing *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969), and *State Farm Mut. Auto. Ins. Co. v. Paynter,* 122 Ariz. 198, 593 P.2d 948 (App.1979), Hmielewski argues that because only one defendant remained at trial, the pretrial agreement did not have to be disclosed to the court. Although in some cases nondisclosure of an agreement to the court may be excused, we find no hard and fast rule permitting nondisclosure because only one defendant is involved in the trial.

¶ 17 In *Damron,* 105 Ariz. at 152, 154, 460 P.2d at 998, 1000, the parties agreed that the plaintiff would not execute against the defendant and in return the defendant allowed judgment to be entered against him. The defendant then assigned to the plaintiffs his claim against the insurance company for bad faith in failing to defend him. *Id.* at 153, 460 P.2d at 999. The plaintiffs attempted to dismiss their complaint against the other defendant. *Id.* The agreement was disclosed to the court. *Id.* at 154, 460 P.2d at 1000. *Damron* does not support Hmielewski's contention that he did not have to disclose the pretrial agreement to the court.

¶ 18 In *Paynter,* 122 Ariz. at 202, 593 P.2d at 952, neither the plaintiff nor the sole defendant revealed to the trial court that they had a *Damron* agreement. A brief trial was held on damages. *Id.* at 200, 593 P.2d at 950. The *Paynter* court posited that it would have been the better practice to advise the trial court of the existence of the agreement. *Id.* at 202, 593 P.2d at 952. However, because the insurer who had to pay policy limits was not prejudiced by the trial court's determination of damages, the *Paynter* court found no reversible error in the failure to disclose the agreement. *Id.* at 203, 593 P.2d at 953.

¶ 19 However, *Mustang Equipment, Inc. v. Welch,* 115 Ariz. 206, 564 P.2d 895 (1977), is more instructive. In *Mustang,* the court

held that a *Gallagher* agreement[1] entered into between the plaintiff and one of two defendants was unenforceable due to the failure of the parties to disclose the agreement to the second defendant's counsel and the court. *Id.* at 211, 564 P.2d at 900. The *Mustang* court noted that the failure to disclose the agreement did not upset the adversarial conduct of the parties at trial, nor did it encourage fraud or collusion. *Id.* at 210–11, 564 P.2d at 899–900. Although the court on appeal found that nondisclosure did not upset the adversarial conduct of the parties, it still could not "condone secret agreements between a plaintiff and defendant which, by their very secretiveness, may tend to encourage wrongdoing and which, at the least, may tend to lessen the public's confidence in our adversary system." *Id.* at 211, 564 P.2d at 900.

¶ 20 In light of our supreme court's expression of disapproval of secret agreements between plaintiffs and defendants, the trial court's displeasure with the undisclosed agreement between the Newcombs and Dr. Bair was justified. Moreover, here, unlike *Mustang,* the agreement may well have affected the nature of the trial. At a minimum, Dr. Bair's attorney agreed not to object to any evidence or to the witnesses produced by the Newcombs at trial. In cases such as *Damron, Paynter,* and *Mustang,* the trials were necessary to reach verdicts on damages so that the plaintiffs could then assert bad faith actions against insurers or seek apportioned damages from the defendants. Even at the outset of this trial, Hmielewski did not intend to see it through to a verdict. He intended only to use the trial as a vehicle for presenting evidence to the court that may have been inadmissible in his attempt to reopen the case against SMH. We believe the trial court correctly concluded that this was an improper use of the trial process.

¶ 21 Although Hmielewski argues that he had no other viable alternatives to protect the interests of his clients, we believe the judicial process did afford him the means of advancing the interests of his clients other than misleading the trial court into conducting a sham trial. His secret end-run around available judicial processes was an affront to the trial court and a violation of the rules requiring attorneys to respect and exercise candor with courts and judicial officers. *See* Rules of the Ariz. Supreme Court 41(c), 42 E.R. 3.3, 8.4(c) and (d). Therefore, we conclude that the trial court did not abuse its discretion in sanctioning Hmielewski.

## III. *Sanctions Against Alcorn and Feola*

¶ 22 Attorneys Alcorn and Feola (defense counsel) present a number of reasons to excuse their participation: (1) they did not know the reasons for the agreement; (2) they did not know whether the Newcombs would live up to their agreement and dismiss Dr. Bair; (3) trial was going to proceed regardless of whether Dr. Bair entered into the agreement; (4) they offered a vigorous defense to the Newcombs' evidence; (5) as advocates of Dr. Bair, their ultimate aim was to procure a dismissal with prejudice or a favorable verdict; (6) their conduct was not motivated by bad faith; (7) Dr. Bair had previously instructed his attorneys not to object to the Newcombs' evidence, so their conduct at trial concerning admission of evidence was not changed by the agreement; (8) Dr. Bair was the only defendant at trial; and (9) there was no preordained result.

¶ 23 Defense counsel have compelling arguments for disparate treatment from that of the plaintiffs' attorneys. It does not appear that their conduct was motivated by bad faith. According to the affidavit of Dr. Bair, he had told them, even during the discovery phase of the case, not to object to any of the Newcombs' evidence.

¶ 24 As defense counsel point out, the court in *Damron* stated:

Any time a plaintiff offers to dismiss with prejudice, the attorney for the party against whom the dismissal is sought has no grounds for objecting when his client's rights are protected. In fact, when a lawyer is retained by a client to defend a lawsuit, his ultimate aim is to procure a dismissal with prejudice or a favorable ver-

---

**1.** *See City of Tucson v. Gallagher,* 108 Ariz. 140, 493 P.2d 1197 (1972).

**6**

dict. We therefore hold a plaintiff has an *absolute right* to a voluntary dismissal of his complaint with prejudice.

105 Ariz. at 153–54, 460 P.2d at 999–1000. We do not believe, however, that the *Damron* court meant to condone a dismissal that involves misleading the trial court about the motives for participating in a trial. While defense counsel may have faced a dilemma concerning the proper course to take to protect their client, their obligation to exercise candor with the trial court supersedes their obligation to their client.

¶ 25 Furthermore, even if motivated by good intentions, the means for achieving dismissal was a misuse of the judicial process. The agreement between the attorneys preordained that the case against Dr. Bair and his professional corporation would be dismissed and the trial would be over once the plaintiffs presented their evidence without objection. Although defense counsel contend that they did not know if the plaintiffs would abide by their agreement, they provide us with no reason to believe that plaintiffs intended to breach the agreement.

¶ 26 During the trial, the judge expressed the following concerns:

> I just want to mention some things that are beginning to concern me. Based on the testimony or examination of Dr. Crowe, I've almost come to the conclusion that there has been some sort of agreement to throw out the rules of procedure for medical malpractice cases, not to mention good chunks of the rules of evidence. And I don't mind that. If you want to do that, that's fine. It's not my province to tell lawyers how to try their cases.
>
> But I am very concerned that we're going to be running over, and that is something that is my problem.

In spite of the trial judge's observation that the trial was proceeding in an unusual manner, Hmielewski assured him that the trial was proceeding as expected, allaying his concerns. Of course, he and the other attorneys knew that only the plaintiffs' case would be presented, while the court did not have that information. It appears the trial court noticed that something was askew and that whatever it was, it was affecting the trial.

The judge's statement shows that the agreement was having a noticeable effect on the evidence and the length of the trial.

¶ 27 Although defense counsel's involvement in the agreement may have been motivated by some supportable reasons, we cannot say that it was an abuse of discretion to impose sanctions on counsel for failing to disclose the agreement to the court and misusing the trial process. We affirm the sanctions against Alcorn and Feola.

RYAN, P.J., and VOSS, J., concur.