IN THE SUPREME COURT OF THE STATE OF ARIZONA
En Banc

| | | |
|---|---|---|
| In the Matter of | ) | Arizona Supreme Court |
| | ) | No. SB-01-0075-D |
| RICHARD A. ALCORN, | ) | |
| Attorney No. 6657 | ) | Disciplinary Commission |
| | ) | Nos. 96-1090 and 96-1092 |
| and | ) | (Consolidated) |
| | ) | |
| STEVEN FEOLA, | ) | |
| Attorney No. 4197 | ) | **O P I N I O N** |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

ON *SUA SPONTE* REVIEW
FROM THE DISCIPLINARY COMMISSION

RESPONDENTS SUSPENDED

State Bar of Arizona                                                                    Phoenix
        By:    Shauna R. Miller
Attorney for State Bar of Arizona

Nancy A. Greenlee                                                                      Phoenix
        - and -
Lewis and Roca, L.L.P.                                                                 Phoenix
        By:    Jeremy E. Butler
                Susan M. Freeman
Attorneys for Respondents

FELDMAN, Justice

**¶1**         We took review of this bar disciplinary matter for two reasons: first, to clarify ethical obligations of lawyers who make agreements that may affect the conduct of a trial; and second, to review the disciplinary proceedings and assess the propriety and proportionality of the sanctions imposed on the lawyers involved in this unusual disciplinary case.

**¶2**         Because this matter affects the practice of law and the conduct of Arizona lawyers, we have appellate and revisory jurisdiction pursuant to article VI, §§ 1, 3, 5(4), and 5(5) of the Arizona Constitution, together with Rules 31, 32, 41, and 42, Arizona Rules of the Supreme Court.[1]

## PROCEDURAL HISTORY

**¶3**         Steven Feola and Richard Alcorn (Respondents) were charged with violating the rules of professional conduct governing all lawyers admitted to practice before the Arizona courts. The specific violations charged were of Ethical Rules (ER) 3.3(a) and ER 8.4(c) and (d), adopted under Rule 42. ER 3.3(a) concerns the lawyer's duty of candor toward the tribunal and forbids false statements of material fact while requiring disclosure of material fact under certain circumstances.[2] ER 8.4 addresses similar concerns, but it is broader in scope than ER 3.3.[3]

---

[1] Ariz.R.Sup.Ct. will hereafter be referenced with "Rule" followed by the relevant rule's numerical designation.

[2] ER 3.3 states in pertinent part:

> (a) A lawyer shall not knowingly:
>
> (1) make a false statement of material fact or law to a tribunal;
>
> (2) except as required by applicable law, fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
>
> * * *

[3] ER 8.4 states in pertinent part:

**¶4** The State Bar filed charges against Respondents in November 1998. After taking testimony at a May 1999 hearing, the hearing officer concluded that the State Bar had "failed to meet its burden to show, by clear and convincing evidence, that Respondents knowingly violated the ethical duty imposed under ER 3.3(a)(1) and (a)(2)." Findings of Fact, Conclusions of Law and Recommendations (Report), filed July 24, 2000. The hearing officer also found that the State Bar had not met its burden of proving that Respondents violated ER 8.4(c) or (d). *Id*. She therefore recommended that the complaints be dismissed. *Id*.

**¶5** After the State Bar filed an objection and requested oral argument, the Disciplinary Commission of the Supreme Court of Arizona (Commission) heard the matter in October 2000. The State Bar argued that Respondents had violated the rules as charged and should be suspended from the practice of law for not less than six months and one day. Respondents took the position that the hearing officer's findings, conclusions, and recommendation for dismissal should be approved.

**¶6** By a 5-to-2 vote, the Commission agreed with the hearing officer that the State Bar had failed to meet its burden in proving violations of ER 3(a)(1) and (2) but concluded there was clear and convincing evidence that Respondents had violated ER 8.4(c) and (d). Disciplinary Commission Report, filed January 28, 2001. Commissioner Carson, a public member, joined the majority but wrote separately, stating that he agreed with the majority only because he feared that otherwise the final vote "might lead to a dismissal as recommended by the hearing officer." *Id.* at 17. He would have accepted the State Bar's request for a suspension of six months and one day but felt that "[d]isbarment might well have been appropriate." *Id*. Commissioners Bowman and Mehrens dissented from the majority

It is professional misconduct for a lawyer to:

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

\* \* \*

and would have accepted the hearing officer's findings, conclusions of law, and recommendation.

¶7          The Commission majority ostensibly adopted the hearing officer's findings of fact in deciding there was clear and convincing evidence that Respondents violated ER 8.4(c) and (d). Yet in explaining the reasons for its decision, the majority effectively made different factual findings. To some extent, this is understandable because many of the hearing officer's "findings of fact" are actually either conclusions of law or mixed findings of fact and conclusions of law. Having concluded that Respondents violated ER 8.4(c) and (d), the Commission considered the appropriate sanction, discussed factors in aggravation and mitigation, made a proportionality analysis, and recommended that this court impose a thirty-day suspension on each Respondent and assess the costs of the disciplinary proceedings against them.

¶8          Neither Respondents nor the State Bar sought our review of the Commission's findings and recommendation. This court, however, has the ultimate authority to decide whether a sanction of suspension or disbarment will be imposed. See Rule 53(d)(4) and (e)(1). When neither a respondent nor the State Bar seeks review of the Disciplinary Commission's recommendation, that recommendation automatically takes effect unless we take *sua sponte* review. *See* Rule 53(e)(7). Having considered the Commission's report in this matter, we entered an order granting *sua sponte* review, asked the parties for supplemental briefs, and heard oral argument. We now conclude that several of the hearing officer's findings of fact were clearly erroneous.[4] We further conclude that Respondents violated ER 3.3(a)(1) and ER 8.4(c) and (d). We disagree, however, with the Commission's recommendation of a thirty-day suspension. Believing that Respondents' violations were quite serious, we conclude that the proper and proportionate sanction is a six-month suspension of each Respondent.

## FACTS

¶9          This proceeding arises from a medical malpractice action filed by a father, on his own

---

[4] In reviewing the hearing officer's findings of fact, the Commission and the court must apply a clearly erroneous standard, while questions of law are reviewed *de novo*. Rule 53(d)(2) and (e)(11).

behalf and on behalf of his infant son (Plaintiffs), against Dr. Bair and Scottsdale Memorial Health Services (the Hospital). Plaintiffs claimed that Dr. Bair and the Hospital were negligent in delivering the child, causing the mother's death and catastrophic injuries to the child. Plaintiffs sought damages for wrongful death and for the child's injuries. Dr. Bair's insurer was insolvent, leaving the doctor to shoulder the financial burden of his own defense. He retained Respondents to represent his interests, but because of his financial condition he told them to do as little work as possible in defending the action. Dr. Bair's exposure, however, was great, and the undertaking to represent him naturally put Respondents in a pressure-filled situation. According to the hearing officer in this case, Respondents did the best they could in attempting to protect their client.

¶10        At first, the Hospital assumed a key role in defending the action; it retained counsel and provided funding for expert witnesses and other costs of defense. The Hospital's position seemed to be that neither it nor Dr. Bair had been negligent, and so Respondents were able to ride the Hospital's coattails in defending the doctor. Unfortunately for Dr. Bair and Respondents, the Hospital eventually moved for and obtained summary judgment in its favor. This, of course, left the doctor as the only defendant who would appear at trial. The trial date was fast approaching, and while Plaintiffs had moved for reconsideration of the order granting summary judgment to the Hospital (technically a motion for a new trial under Rule 59(a), Ariz.R.Civ.P.), the trial against Dr. Bair was scheduled to start before the judge heard arguments on that motion. Thus, Respondents were faced with the necessity of preparing for trial without the benefit of the Hospital's participation or its expert witness.

¶11        Help arrived in the nick of time. Not long before trial, Mr. Hmielewski, one of Plaintiffs' lawyers, wrote to Respondents with a proposal. Letters were exchanged between Hmielewski and Respondents, but it is sufficient for our purposes to set forth the essence of the unusual agreement made through their exchange.

        1.        Plaintiffs would give Dr. Bair a covenant not to execute.

        2.        Notwithstanding the covenant and the fact that Dr. Bair would be the only defendant participating, the trial would proceed with the entire panoply of court proceedings — judge, jury, and

5

witnesses.

3. On behalf of Dr. Bair, Respondents "would not object to the scope or form of any inquiry [Plaintiffs' counsel] conducted at trial, including the witnesses [he] chose to call." *See* December 20, 1995 letter from Hmielewski to Alcorn.[5]

4. The agreement would remain confidential. Hmielewski was "comfortable" with this secrecy agreement because Respondents' agreement regarding the conduct of trial would only apply "if Dr. Bair is the only defendant at trial." *Id.*

5. Most remarkable is the following provision: "Specifically, [Plaintiffs] agree that, at the close of plaintiffs' case, [Plaintiffs] will agree to voluntarily dismiss with prejudice their claims and action against Dr. Bair and his corporation. Further, [Plaintiffs] agree that Dr. Bair or his corporation will not be named by them as a defendant in any subsequent action relating to this matter." December 27, 1995 letter from Alcorn to Hmielewski.

¶12 The benefit to Respondents' client is apparent; the agreement would effectively release Dr. Bair from any liability for the events described in the complaint. The benefit to Plaintiffs is more difficult to ascertain. Their claim against Dr. Bair was worth little absent the Hospital's liability because Dr. Bair was without liability insurance or assets to satisfy the kind of judgment Plaintiffs expected in light of their injuries. The purpose of the agreement, as we understand it, was to "educate" the trial judge as to the Hospital's culpability so he could use this background in deciding whether to reconsider his grant of summary judgment to the Hospital.[6]

---

[5] Evidently one reason for the provision about witnesses was that Plaintiffs had decided, at the last minute, to exhume the deceased mother's body and were hoping to offer some expert testimony on the cause of death. The expert, of course, had not been named in pretrial documents.

[6] We are bewildered by this theory. The trial judge's grant of summary judgment was, of course, made on the basis of the record as it existed at the time he heard the motion. The propriety of the order granting summary judgment was to be evaluated in the same manner, unless Plaintiffs could show newly discovered evidence. *See* Rule 60(c), Ariz.R.Civ.P. If Plaintiffs had newly discovered evidence, one would think it would have to be established in the hearing on the motion rather than in the type of trial contemplated by this secret agreement — a proceeding in which the Hospital would not be a participant. We doubt that able counsel for the Hospital would consider their client bound by the

6

¶13 The hearing officer found that before signing the agreement, Respondents researched the case law to determine whether the confidentiality provision was valid and whether they would be ethically obligated to disclose the existence of the agreement to the trial judge. Having performed this research, and believing the case law unclear, they consulted with other lawyers, both within and outside their firm. They reportedly received some conflicting opinions, but the conclusion seems generally to have been that the agreements might not be enforceable but that they need not be disclosed. We shall consider that legal conclusion later in this opinion.

¶14 Based upon the foregoing considerations, Respondents signed the letter agreements and then proceeded to trial before judge and jury. The trial took ten days over two or three weeks. The hearing officer found that Respondents not only cross-examined Plaintiffs' witnesses but, by dint of some arrangement with Plaintiffs' counsel, called a witness during Plaintiffs' case. The witness was Dr. Clark, an obstetrical expert the Hospital had hired for its own defense. Evidently, the Hospital attempted to help Dr. Bair by lending its expert to Respondents, even going so far as to pay the expert's fees. Of course, in providing this help, the Hospital and its lawyers were not told of the secret agreement — but then, neither was the trial judge. Because the expert appeared only on the Hospital's disclosure statement, it seems unlikely, absent their pretrial agreement, that Respondents could have called him over Plaintiffs' objection.

¶15 Plaintiffs moved for a mistrial at the conclusion of their case in chief, claiming among other things that "[t]he court and jury have been the victims of untruthful testimony which goes to the very foundation of plaintiffs' claims for relief, and if the untruthful testimony is believed, plaintiffs will be effectively precluded from their claims and remedies." Plaintiffs' Motion for Mistrial, *Newcomb v. Bair*, January 22, 1996 (CV 92-22705). The trial judge denied this rather unusual motion, and Plaintiffs' counsel thereupon performed their obligation under the letter agreement by moving to dismiss with prejudice. The trial judge was surprised by this turn of events and inquired. At that point, seeking

education imparted to the trial judge without benefit of any adversary proceedings.

7

to quell the trial judge's suspicions, Alcorn initiated the following colloquy:

> MR. ALCORN: May I be heard very briefly, your honor? I think we've – what we've done is shifted gears from the Motion for Mistrial. Correct me if I'm wrong, Mr. Hmielewski. And now counsel is avowing to the Court that he is willing to dismiss his entire case against Dr. Bair and his professional corporation with prejudice. Obviously, if the Court's not disposed to grant the Plaintiffs' motion [for mistrial], I would move that the case be dismissed with prejudice. And if they will stipulate to it, that may provide a basis.

> THE COURT: All right.

> MR. ALCORN: But it seems like I am being forced to subject my client to a jury when in fact I've got a chance to get out of the case once and for all with prejudice.

> THE COURT: Mr. Alcorn, if you and Mr. Hmielewski agree to settle this case with a dismissal with prejudice against Dr. Bair, I'll call the jury in and tell them the case is settled, and it's all over. I am perfectly willing to do that. As a matter of fact, I don't know that I have any power to do anything else or would even consider it.

> MR. HMIELEWSKI: May we have five minutes?

> THE COURT: But I am not going to leave the case unconcluded on the basis of what's been presented to me so far.

> MR. ALCORN: I understand. I think we do have an agreement, but I suppose we need a few minutes to formalize that.

***

> THE COURT: And you know, if you all – what I'm going to do is bring the jury back in and recess them for lunch, and that will give you until 1:30 to do whatever it is you think you might be able to do. But I will tell you now, *I don't want any sweetheart deals that I am not fully informed about anywhere.* You have to take this situation as you now find it. *And I don't want it crafted in some way or another that is – that would be misleading to me.* Okay.

> MR. JOHNSON (Hmielewski's co-counsel): Absolutely, your honor.

***

> MR. ALCORN: Your Honor, could I make a couple of points

8

briefly?

THE COURT:          Please.

MR. ALCORN:          The dismissal should be with prejudice.

MR. HMIELEWSKI:  Agreed.

MR. ALCORN:          And counsel is in agreement with that. Secondly, although we think we have a binding stipulation under Rule 80, Mr. Hmielewski or Mr. Johnson will formalize that and present it to the Court, as he indicated. And we want to give our assurances to the Court that there will be no sweetheart deals. There's no agreements regarding future testimony by Dr. Bair or the substance of any testimony by Dr. Bair. There's no payment of any consideration from either side in connection with the settlement.

THE COURT:          Okay. Well, good. I'm glad to hear that.

Reporter's Transcript on Appeal (RT), January 8, 1996, at 297-300 (CV 92-22705). Thus, the trial judge ordered the case dismissed with prejudice.

¶16          Later, during the hearing on Plaintiffs' motion for new trial on the summary judgment granted to the Hospital, the trial judge discovered the true nature of the agreement, including the confidentiality provision, and ordered a hearing on the question of sanctions. After that hearing, the judge ordered sanctions imposed on all of the lawyers, based on his finding that, in failing to disclose the agreement to the court, they violated ERs 3.3 and 8.4. The judge consequently imposed a $15,000 fine on each lawyer. Respondents appealed the sanction order, claiming they had not violated the ethical rules, but the order was affirmed on appeal. *See Hmielewski v. Maricopa County*, 192 Ariz. 1, 960 P.2d 47 (App. 1997). We denied review. The State Bar then initiated proceedings against all of the lawyers involved.[7]

---

[7] Censure was the only sanction that our bar imposed on Hmielewski, who is not a member of the Arizona bar. Although Rule 33(d) provides an avenue to hold disciplinary proceedings for out-of-state counsel, any disciplinary action beyond what was done in this matter would have to be taken in Florida, the offending attorney's home state bar, as a matter of comity. Thus, we content ourselves with the censure and revocation of Hmielewski's *pro hac vice* status. His Arizona co-counsel was Rodney G. Johnson of Phoenix. *See Hmielewski*, 192 Ariz. at 2 ¶ 5, 960 P.2d at 48 ¶ 5. Johnson, who

## DISCUSSION

### A.    Duty to disclose

¶17        Respondents still contend that they had no duty to disclose their agreement to either the judge or the Hospital. The hearing officer believed that Respondents held this view "in good faith." Report at 5. The hearing officer therefore concluded there was no violation of ER 8.4(c) and (d). *Id.* We turn first to the issue of whether Respondents had a duty to disclose — an issue of importance in both this and future cases.

#### 1.    Arizona's law on disclosure of settlement agreements, partial settlement agreements, and quasi-settlement agreements

¶18        The Arizona Reports are replete with discussion of various types of agreements made between trial counsel. We have examined *Gallagher* agreements, *Damron* agreements, *Morris* agreements, *Bradshaw* agreements, and agreements that have yet to be dignified with case names, such as high-low agreements and guaranty agreements. Having read the past cases, Respondents concluded there was no duty to disclose their unique agreement. They argue that their reading of the cases was correct or at least arguably so.

¶19        We first alluded to such agreements in *Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969). *Damron* was a damages action against two defendants, only one of whom was defended by insurance counsel. The insurers for the second defendant refused to provide a defense, claiming there was no coverage, thus leaving the second defendant to his own devices. Eventually the uninsured defendant and the plaintiff's lawyer agreed that the former would receive a covenant not to execute in exchange for assigning to the plaintiff the bad faith claim against his putative insurer. The plaintiff would then dismiss with prejudice against the insured defendant while the agreeing defendant would withdraw his answer and allow the plaintiff to take a default judgment. The agreement *was disclosed*

---

played only a passive part in these events, made a consent agreement with the State Bar, and the hearing officer recommended a censure. *See* State Bar file number 96-1107.

to the trial judge and to the lawyer for the insured defendant, who for some reason — perhaps shock at the use of this new technique — objected vehemently to the whole process, saying that he thought the agreement was "tainted with conspiracy, chicanery, and fraud . . . ." *Id.* at 153, 460 P.2d at 999. The trial judge, perhaps also surprised, concluded that the agreement was collusive and fraudulent and therefore dismissed the entire case. We reversed on appeal, holding that the deal was not "ipso facto collusive." *Id.* We also held that while the trial judge had inherent power to dismiss a collusive case, the judge could not do so without taking evidence to establish such collusion:

> It cannot be held that as a matter of law collusion exists simply because a defendant chooses not to defend when he can escape all liability by such an agreement, and must take large financial risks by defending. If, at a hearing, where the testimony comes from *sworn witnesses* rather than from arguments of the attorneys, it appears the defendant instead of defaulting agrees to perjure himself . . . , *or if some other definite evidence of collusion is adduced by proper testimony, a dismissal of the entire action may be justified.*

*Id*. at 155, 460 P.2d at 1001 (emphasis added).

¶20    There are significant differences between *Damron* and the present case. The *Damron* agreement was disclosed and the parties did not undertake a sham[8] trial in front of a judge and jury. Finally, unlike the present case, the court only held a default hearing, not a supposedly adversarial trial. Nothing we said in *Damron* legitimizes what was done here.

¶21    In *City of Tucson v. Gallagher*, 108 Ariz. 140, 493 P.2d 1197 (1972), the plaintiff gave a covenant not to execute to one of two defendants, but it was to be effective only above a certain amount, thus guaranteeing the plaintiff a minimal recovery from one or both of two defendants. We found no deprivation of a fair trial because, under the circumstances, this type of agreement could change neither the agreeing defendant's motive nor trial tactics in defending the case, and nothing that occurred during the trial demonstrated any impropriety. *Id*. at 142-43, 493 P.2d at 1199-1200. As in *Damron*, there are important differences between *Gallagher* and the present case. First, the *Gallagher* agreement

---

[8] We use the term "sham" because in our case the parties to the trial had agreed that the trial would have no result of any kind — the action would be dismissed at the end of Plaintiffs' case in chief.

11

was disclosed to the trial judge.[9] Second, the trial that followed the making of the covenant was real. There was no agreement that the plaintiff would dismiss at the end of the plaintiff's case; the second defendant was present and could and did defend as its trial strategy dictated. *See id*. *Gallagher* is no help to Respondents.

**¶22**        Respondents next rely on *Mustang Equipment v. Welch*, 115 Ariz. 206, 564 P.2d 895 (1977). The *Mustang* agreement did contain a confidentiality clause. Mountain States, one of two defendants, and the plaintiff agreed that if a verdict was returned against both Mountain States and Mustang, the plaintiff would execute only against Mustang. This, of course, gave Mountain States a motive to blame Mustang for the accident that caused the plaintiff's damages. *Id*. at 208, 564 P.2d at 897. We concluded that the "particular agreement entered here did not encourage fraud or collusion" because Mountain States had already cross-claimed against Mustang, and even without the agreement it would have attempted to show that Mustang's negligence had been the only cause of the accident. *Id*. at 210, 564 P.2d at 899.

**¶23**        Thus, we were "satisfied" that non-disclosure of the agreement had not affected "the integrity of the trial." *Id*. at 211, 564 P.2d at 900. But we were disturbed by the non-disclosure and believed that failure to disclose such agreements could improperly affect many aspects of a case, including settlement, trial strategy, and arguments. Consequently, we concluded it was "better policy to require candid disclosure of all *Gallagher*-type agreements to the court and to all parties concerned . . . ." *Id*. In closing the opinion we used the following words, which we believe should have controlled Respondents' duty to disclose in the malpractice action against Dr. Bair:

> Finally, we think this is a matter of public policy. While we recognize that under the particular fact situation of this case there was neither fraud, collusion nor unethical conduct involved, we cannot condone secret agreements between a plaintiff and defendant which, by their very secretiveness, may tend to encourage wrongdoing and which, at the least, may tend to lessen the public's confidence in our adversary system.

---

[9]  *See City of Tucson v. Gallagher*, 14 Ariz.App. 385, 387, 483 P.2d. 798, 800 (App. 1971).

12

> Pursuant to the foregoing, we hold the agreement entered into between Welch [plaintiff] and Mountain States [defendant 1] to be unenforceable due to the failure of the parties to disclose the agreement to counsel for Mustang [defendant 2] and to the court.

*Id.*

**¶24**     The *Mustang* language is particularly applicable to the present case because the agreement before us is considerably less benign than that in *Mustang*. The trial in *Mustang* was to be a real trial with real results, not a pretense. The *Mustang* plaintiff did not agree to dismiss with prejudice before the case was submitted to the jury, nor did either *Mustang* defendant agree to allow the plaintiff's counsel free rein to do anything they wanted in presenting the case.

**¶25**     But, say Respondents, our court of appeals made it clear that the holding in *Mustang* had no application to cases like theirs, in which there was only a single party defendant. *See State Farm Mut. Auto. Ins. v. Paynter*, 122 Ariz. 198, 593 P.2d 948 (App. 1979). We disagree with this contention for two reasons. First, there were two defendants in this case, and both were parties at the time the agreement was made. The Hospital was still a party because Plaintiffs had moved for a new trial with regard to the order granting it summary judgment; therefore, any judgment entered in favor of the Hospital was not yet final and appeal was possible. Moreover, while the motion was pending, the Hospital was very much "directly interested in the subject matter of the suit . . . ." *See State v. Lamberton*, 189 Ariz. 47, 49, 899 P.2d 939, 941 (1995). Second, the Hospital was still active in the case, assisting Respondents by providing and paying for an obstetrical expert to testify for Dr. Bair.

**¶26**     Thus, we do not believe *Paynter* validates the procedure Respondents followed in Dr. Bair's case.[10] In *Paynter*, the court of appeals held that the failure to disclose the agreement did not

---

[10] Again, there are significant differences between *Paynter* and this case. *Paynter* was similar to the *Damron* situation — there was no coverage, and State Farm refused to indemnify or defend its insured against Paynter's damage claim. Paynter and the insured therefore made a pretrial agreement in which the defendant assigned his rights against his insurer in exchange for the plaintiff's covenant not to execute on any judgment. In effect, the defendant allowed the plaintiff to take judgment by default. *Id.* at 199, 593 P.2d at 949. There was no sham adversary trial. Further, the court pointed out that it "would certainly have been better practice to advise the trial court of the existence of the *Damron* agreement, particularly in order to ensure the trial court's fair scrutiny of damages." *Paynter*,

require reversal because the language in *Mustang* and *Gallagher* applied to agreements "between the plaintiff and only one of two defendants." *Paynter*, 122 Ariz. at 202, 593 P.2d at 952. Thus, the hearing officer found that Respondents took considerable comfort in *Paynter* and had a genuine belief that it freed them from any duty to disclose their agreement.

¶27    Accepting this for whatever it is worth, we now put an end to any comfort that others might feel in the future. We must reject Respondents' single-party argument and, insofar as it may be supported by *Paynter*, we must reject such an interpretation of that case. Respondents' argument and their reliance on *Paynter* overlook the presence of a very important participant in the case — the trial judge. The judge is not just a casual observer of the passing scene but has important responsibilities in an adversarial system. While the judge is not a party as are litigants who produce evidence or argue the case, he or she is more than a referee presiding in a merely formal or ritualistic role. In an adversarial system, the judge is responsible for ensuring that justice is accomplished according to the substantive rules and procedural mechanisms established by law. Those procedural rules do not contemplate hoodwinking judges any more than jurors. While some things must be excluded from jurors' consideration to focus their attention on matters legally relevant, the rules do not contemplate hiding the true nature of the proceeding from the judge. Nor do they permit lawyers to remain silent when it is evident that the judge has been misled about what is occurring in his own courtroom.

¶28    Thus, the words we used in *Mustang* should have been considered the law of this state. Any agreement that, by its nature, "may tend to encourage wrongdoing" or "may tend to lessen the public's confidence in our adversary system" cannot be condoned if kept secret. *Mustang*, 115 Ariz. at 211, 564 P.2d at 900. We hold today, as strongly as possible, that any agreement that has the *potential* of affecting the manner in which a case is tried is one that may encourage wrongdoing and must therefore be disclosed to the trial judge and all litigants in the case. Thus, Respondents did have a duty to disclose. The hearing officer found, however, that after adequate research Respondents had a good faith belief

---

122 Ariz. at 202, 593 P.2d at 952.

14

that they had no duty to disclose. So far as Respondents' failure to disclose the covenant not to execute is concerned, we accept the finding and on that basis conclude that Respondents made only an error of law rather than a violation of the ethical rules. We do not sanction lawyers for good faith errors of law. *See In re Meyers*, 168 Ariz. 558, 560, 795 P.2d 201, 203 (1990).

### 2. Actual fraud and collusion

¶29    We turn then to the core of the problem — the question of conducting a trial without disclosing to the trial judge that there was no result expected other than dismissal before the case went to the jury. While research and consultation on and about our previous cases might have led Respondents to conclude there was no duty to disclose the covenant, no research could have produced the conclusion that a lawyer could fail to tell a trial judge that the case being tried for two weeks was actually a moot court exercise. But the hearing officer actually found that the interests of Dr. Bair and Plaintiffs "remained adverse"; that, because the agreement might be unenforceable, there was "no assurance that Plaintiffs' counsel would in fact dismiss the case with prejudice at the close" of Plaintiffs' evidence; and that Respondents therefore had to prepare and try the case as if there had been no agreement. Report at 5. Thus, the hearing officer concluded, there was neither "collusion, fraud [n]or unethical conduct." *Id*.

¶30    We reject these findings as clearly erroneous and the conclusion as legal error. The agreement is, on its face, collusive. Any agreement by which one purported opponent must allow another to conduct a supposedly adversarial trial in any manner it wants is inherently collusive. If the adversary system means anything, it means that opposing parties will adopt a self-serving strategy. Based on the facts and the law, this strategy may or may not require preventing one opponent from doing whatever it wants. But, the agreement in question provided that Dr. Bair would make no objection to whatever evidence and witnesses were presented by Plaintiffs, without regard to whether that evidence was helpful to Dr. Bair, whether it was admissible, or whether the witnesses were disclosed or even competent to testify. Whatever may have happened during the trial, the agreement itself transformed Dr. Bair

15

from an adversary into a marionette that Plaintiffs' counsel could manipulate in furtherance of their own ends. In the long run, the agreement would have furthered Dr. Bair's interests because he benefitted from the covenant not to execute, but the agreement was inherently collusive because it committed Respondents to further a scheme to use a seemingly adversarial trial for an improper purpose.

¶31     We come then to the question of fraud — the so-called trial. Plaintiffs were obligated to put on their evidence and then dismiss with prejudice. While Respondents claim they had no way to know that the agreement was enforceable on this point, we are not so naive as to believe they would not have made every attempt to extricate their client from his precarious position by attempting to enforce the agreement. The combination of the agreement about presentation of evidence, the agreement to dismiss before the case went to the jury, and the covenant not to execute rendered this so-called jury trial a charade, evidently intended to improperly influence the trial judge. We can describe it best by quoting the words of Judge Moroney, the trial judge. When he finally discovered what had occurred, he had the following to say:

> The lawyers involved duped the court into conducting a mock trial at the taxpayers' expense to serve their own ends. Because of that fraud on the court, at least the following wrongful acts occurred. Nine citizens of this county were ordered by the court to set aside nine working days of their lives at $12.00 a day, minus parking, so that they could serve as props in a charade. This judge, the court staff, and the facilities of this division, were occupied for over two weeks to further a devious private purpose, thus robbing legitimate litigants of what it is this court is here to do. Lawyers, as officers of the court, abused their licenses and ordered persons to be witnesses, coercing their presence by the illegitimate invocation of the contempt power of this court. This judge was even induced to order a non-party to produce a witness who did not wish to play in the game.

Minute Entry, May 20, 1996, at 5 (CV 92-22705).

¶32     Strong words, but we believe they were justified. The agreement was inherently collusive, and the manner in which it was implemented worked a fraud on the court, to say nothing of the jury, the witnesses, and the Hospital; all were led to believe Plaintiffs and Dr. Bair were engaged in a real trial with a real purpose — to decide whether Dr. Bair was liable and, if so, to assess appropriate damages. In reality, it was prearranged that neither issue would be decided. The only explanation given for this

16

entire charade was patently illegitimate. If the trial judge was to be educated for the pending motion on the order granting summary judgment to the Hospital, the parties should have presented whatever newly discovered evidence or argument there might have been in the motion proceedings and not by means of a mock trial in which the Hospital did not participate. The trial judge's characterization, quoted above, is accurate. Such conduct is inherently prejudicial to the administration of justice. *Cf. In re Shannon*, 179 Ariz. 52, 67, 876 P.2d 548, 563 (1994) (attorney's failure to execute satisfaction of judgment before cashing check, resulting in motion to compel and five-month delay, was undue waste of court resources and prejudicial to administration of justice).

¶33    We thus conclude that Respondents violated ER 8.4(d), which forbids conduct prejudicial to the administration of justice. Wasting weeks of court time and inconveniencing jurors and witnesses in a sham proceeding is a paradigm of such conduct.

### 3.    Failure to respond to the trial judge's inquiries

¶34    The hearing officer concluded that Respondents "neither ignored their duty to the court nor negligently or knowingly violated it." Report at 5. We reject this mixed finding and conclusion as factually unsupported and legally erroneous. Even *assuming*, as the hearing officer found, that after adequate research Respondents reached a good faith conclusion that they had no duty to disclose the existence of the agreement, this certainly would not justify failing to tell the trial judge that it had been agreed that the trial would not go to verdict, that there was to be no result except to inform the judge's decision on an issue not even being tried. Obviously, the lawyers involved wished to keep this from the judge because they knew he would never have knowingly permitted it. As noted above, no Arizona case stands as authority permitting non-disclosure on these facts, and so far as we know, there is no case in the country legitimizing such confidentiality. But the lawyers went beyond this — they actively misled the trial judge. In fact, the trial judge went so far as to state that the lawyers "deliberately misrepresent[ed] facts." *See* Minute Entry of May 20, 1996, at 6.

¶35    Although the hearing officer seemed to believe there was no misrepresentation or

misleading statement, the limited record before us indicates otherwise. The trial judge expressed his

views during the trial as follows:

> I just want to mention some things that are beginning to concern me. Based on the testimony or examination of Dr. Crowe, I've almost come to the conclusion that there has been *some sort of agreement to throw out the rules of procedure for medical malpractice cases, not to mention good chunks of the rules of evidence.* And I don't mind that. If you want to do that, that's fine. It's not my province to tell lawyers how to try their cases. But I am very concerned that we're going to be running over, and that is something that is my problem.

*See Hmielewski*, 192 Ariz. at 6 ¶ 26, 960 P.2d at 52 ¶ 26 (emphasis added). As the court of appeals

noted:

> [When the trial judge observed] that the trial was proceeding in an unusual manner, Hmielewski assured him that the trial was proceeding as expected, allaying his concerns. Of course, he and the other attorneys knew that only the plaintiffs' case would be presented, while the court did not have that information. It appears the trial court noticed that something was askew and that whatever it was, it was affecting the trial. The judge's statement shows that the agreement was having a noticeable effect on the evidence and the length of the trial.

*Id.*

**¶36** Respondents' contribution to the exchange between Hmielewski and the judge was

no more revealing than Hmielewski's; the judge said:

> Well, what I am getting here from Mr. Hmielewski is that he's going to call all of your witnesses, and that means that when he rests, you rest? How's that Mr. Alcorn?

Alcorn replied:

> I don't know. I had a brief discussion with Mr. Hmielewski where we raised these issues, but clearly I'm not at this moment totally comfortable with the time line he's putting on this. There may be two or three other witnesses we would want to call, not in the nature of expert witnesses certainly.

RT at 201-02. What was Respondents' legitimate interest in calling witnesses when the case was to

be dismissed at the close of Plaintiffs' evidence? If, as Respondents claim, they had to be ready to

18

go forward if Hmielewski breached his agreement to dismiss, it was incumbent upon them to be honest with the judge. They hoped not to put on any witnesses because they believed Plaintiffs would dismiss.

¶37     Later, when Plaintiffs proposed to dismiss with prejudice, the judge inquired again about the unusual nature of the proceeding and made his concern clear — he did not "want any sweetheart deals that [he was not] fully informed about anywhere." *See supra* ¶ 15 for full quote. The trial judge did not want anything "crafted" in a way that "would be misleading to" him. *Id.* Respondents gave their "assurances to the Court that there will be no sweetheart deals." *Id.* True, the judge's inquiry was not as precise as it might have been; true, Respondents correctly represented that there was no agreement regarding future testimony or payment of consideration. But, to paraphrase Justice Stewart, while we may not be able to define a sweetheart deal, we know enough to recognize one when we see it. If ever there was such a deal, this was it, and we believe that Respondents, like any other experienced trial lawyers, knew what the trial judge meant and knew that they had such a deal. Instead of being frank and open when the judge made it clear he wanted to know what was happening, they gave the judge a response that must be characterized as knowingly evasive at best and deliberately misleading at worst.

¶38     There is no question regarding how the trial judge characterized the situation when he later learned the truth. He felt he was "duped," that there had been "fraud on the court," and that the lawyers' conduct was "misleading." *See* Minute Entry of May 20, 1996, at 5-6. "Deliberately concealing" the agreement was "tantamount to knowingly making a false statement of a material fact to a tribunal." *Id.* Relying on our opinion in *In re Fee*, 182 Ariz. 597, 898 P.2d 975 (1995), however, Respondents argue that they did not lie but merely remained silent with respect to the subject of the judge's inquiry. Even if this was a proper characterization of the events, *Fee* does not justify silence that misleads the court. In *Fee* we said that the lawyers could have either disclosed the fee agreement with the client or "politely declined any discussion of fees." *Id.* at 601, 898 P.2d at 979. Either alternative would have put the court on notice that the lawyers did not consent to the settlement judge's attempts to intervene in the agreement between themselves and their client and would have left the issue of

19

attorneys' fees to be decided by the trial judge. But *Fee* does not give any legitimacy to the idea that a lawyer can remain silent while knowing that such silence has the effect of misleading the court. *Fee* stands for the opposite principle — we held that the lawyers in *Fee* violated both ER 3.3(a)(1) and ER 8.4(c) and (d) for remaining silent when it was obvious that the judge was misled. Silence may be golden but not when the lawyer misleads the court by failing to speak.

¶39 Respondents' view of their exchanges with the trial judge is quite benign: in essence, they would have us hold that the judge did not ask the right question, so they did not tell a falsehood. Even were we to accept this factual predicate, as the hearing officer evidently did, we would reach the opposite conclusion. Applying the most generous characterization, Respondents' evasions violated ER 8.4(c), which prohibits "conduct involving . . . fraud, deceit or misrepresentation." Fraud, as used in Rule 42, "denotes conduct having a purpose to deceive and not merely negligent misrepresentation or failure to apprise another of relevant information." Terminology, Preamble to Rule 42. In answering the trial judge's inquiries, Respondents went beyond mere failure to apprise or disclose and affirmatively misled; they deceived the trial judge by answers that purposefully disguised the true situation when any "lawyer of reasonable prudence and competence" would have known that the judge's inquiry required disclosure. *See id.*; *Fee*, 182 Ariz. at 601, 898 P.2d at 979. Thus, Respondents' answers to the trial judge violated ER 8.4(c).

¶40 Respondents were also charged with violating ER 3.3(a)(1), prohibiting false statements of fact or law to a tribunal. The hearing officer found the ER 3.3 charge unsupported and recommended dismissal. The Commission agreed and dismissed the charge. We believe that Respondents' conduct violated ER 3.3(a)(1), and that the contrary findings by the hearing officer and the Commission are clearly erroneous. Under some circumstances, failure to make a necessary disclosure is tantamount to an affirmative misrepresentation. *See Fee*, 182 Ariz. at 600, 898 P.2d at 978 (citing comments to Rule 3.3); *see also In re Wilka*, ___ N.W.2d ___ (S.D. 2001), 2001 SD 148 (attorney who made truthful statements in course of "intentionally evading plain and understandable questions" misled the court

20

by misrepresenting the evidence).  In this instance it is enough for us to note that the conduct violating ER 8.4(c) may be more specifically identified by reference to ER 3.3(a)(1).

> Modern lawyer codes contain one or more provisions (sometimes referred to as "catch-all" provisions) stating general grounds for discipline, such as engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation" (ABA Model Code of Professional Conduct, Rule 8.4(c) (1983)) . . . .  Such provisions are written broadly both to cover a wide array of offensive lawyer conduct and to prevent attempted technical manipulation of a rule stated more narrowly.  On the other hand, the breadth of such provisions creates the risk that a charge using only such language would fail to give fair warning of the nature of the charges to a lawyer respondent . . . and that subjective and idiosyncratic considerations could influence a hearing panel or reviewing court in resolving a charge based only on it.

1 RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 5 cmt. c. (2000).  Respondents violated ER 3.3(a)(1).

## B. Appropriate sanction

¶41      This court has long held that "the objective of disciplinary proceedings is to protect the public, the profession and the administration of justice and not to punish the offender." *In re Kastensmith,* 101 Ariz. 291, 294, 419 P.2d 75, 78 (1966).  That does not mean, however, that we will be swayed by the character of the offending attorney's practice, the impact of sanctions upon the attorney's livelihood, or the resulting degree of any psychological pain experienced by the attorney. *In re Scholl*, 200 Ariz. 222, 224 ¶10, 25 P.3d 710, 712 ¶10 (2001) (citation omitted).  Instead, we will look to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (Standards) for guidance. *See, e.g., In re Higgins*, 180 Ariz. 396, 400, 884 P.2d 1094, 1098 (1994).  After finding a lawyer's misconduct, we consider the following factors in imposing a sanction:  (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.  Standard 3.0.

¶42      As to the first two factors, we have already determined that Respondents violated ER 8.4(c) and (d), thus abdicating some of the most fundamental obligations of professional and personal integrity

21

by affirmatively misleading the judge when he became suspicious. We are deeply troubled by these serious violations of duty, which could lead to disbarment. But the record supports the finding that Respondents' intentional deceptions and evasions were more likely the result of a failure to grasp their true obligations to the tribunal rather than an attempt to misuse the process for personal gain. We also accept the finding that Respondents were motivated by an honest desire to do everything within their power to help their client. In light of these factors, disbarment is not indicated.

¶43    As to the third factor, we note that the misconduct caused very serious injury. Not only was the system injured by a waste of time and scarce resources, it was also damaged in the sense that the jurors and witnesses had their time wasted and lives disrupted in furtherance of a farce, thus eroding public confidence in the integrity of our profession. Furthermore, the scheme was intended to improperly set up the Hospital for liability on a claim with damages potentially measuring in the millions. Finally, Respondents' own client was damaged; when the trial judge discovered the scheme and vacated his earlier order of dismissal with prejudice, Dr. Bair was once again left facing trial as the sole defendant, notwithstanding that he incurred $45,000 in attorneys' fees to Respondents — fees computed in part as charges for ten days of so-called trial.

¶44    Finally, we consider any aggravating and mitigating factors. Each Respondent has had a prior disciplinary sanction, which is normally an aggravating factor under Standard 9.22(a); however, because the time and facts of their prior offenses are remote from those at issue today, we do not view them as seriously aggravating. Standard 9.32(m). We do find another aggravating factor applicable under the facts of this case: each Respondent has significant experience in the practice of law and should have known better than to participate in a show trial and actively mislead a judge.

¶45    Several mitigating factors apply as well. First, as noted above, we find no selfish motive. Standard 9.32(b). But doing everything within one's power to help one's client is not the same as license to do anything. Ordinarily, a lawyer should do everything morally and ethically proper in presenting a client's case or helping to resolve the client's problems. But this does not permit conduct

22

that deceives the court, deceives an opposing party, and wastes the time of judge, jury, and witnesses by an undisclosed and meaningless performance. It is often said that a lawyer is an officer of the court. If the phrase is to have any real meaning, it must require that ethical obligations to the court be put ahead of the duty to assist a client. As the Ohio Supreme Court stated in *Office of Disciplinary Counsel v. Greene*, 655 N.E. 2d 1299, 1301 (1995):

> While an attorney, as a zealous advocate, may characterize facts favorable to the attorney's client, the attorney's duty, as an officer of the court, is to uphold the legal process and demonstrate respect for the legal system by at all times being truthful with a court and refraining from knowingly making statements of fact or law that are not true. Respect for the law and our legal system, through both an attorney's words and actions, should be more than a platitude.

In this case, therefore, we are not disposed to attach much mitigating weight to the fact that Respondents were only attempting to assist their client. The ethical rules set limits to how lawyers may assist their clients and require that lawyers' primary allegiance be to the system of justice.

¶46        Second, Respondents have exhibited a cooperative attitude toward the disciplinary proceedings. Standard 9.32(e). Third, also noted above, they have already suffered the $15,000 fines and public record of their misconduct. Standard 9.32(k). And finally, we see no danger that Respondents will repeat such misconduct in the future; they have apparently practiced without incident since the time of the underlying action. Thus, we see no need to impose a suspension of six months and one day. Any suspension longer than six months requires that the suspended lawyer apply for reinstatement and make a showing of rehabilitation once the suspension period has expired. *See* Rule 71(d) and (h); Rule 72. From a pragmatic standpoint, of course, the process of application and consideration of a petition for reinstatement may extend the suspension period far beyond six months and one day. A suspension of six months or less, on the other hand, results in eligibility for reinstatement upon filing of an affidavit pursuant to Rule 71(c) at the end of the suspension period.

¶47        Given the very serious nature of Respondents' conduct, suspension is the only appropriate sanction. Moreover, the Standards' suspension provision addresses their conduct directly:

23

> Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

Standard 6.12. The Standards also indicate that when suspension is appropriate, it should generally be imposed for a term of six months or more but not exceeding three years. *See* Standard 2.3.

**¶48** Perhaps more important than rehabilitation of an individual attorney, however, is the value of discipline as a deterrent to other attorneys and as a process that maintains "the integrity of the profession in the eyes of the public." *In re Fioramonti,* 176 Ariz. 182, 187, 859 P.2d 1315, 1320 (1993) (citation omitted). The critical importance of these interests compels us to impose a sanction greater than that recommended by the Commission. It is within this court's power as the ultimate authority in disciplinary matters to "up the ante" when necessary. *See In re Walker*, 200 Ariz. 155, 159 ¶ 15, 24 P.3d 602, 606 ¶ 15 (2001).[11]

**¶49** Finally, we look to other, similar cases in determining whether the sanction imposed is proportionate to the misconduct charged. The *Fee* case is the closest analogue to the present matter. In *Fee*, the settlement judge proposed a structured settlement, largely to reduce attorneys' fees, but the plaintiff and her counsel reached an agreement whereby the plaintiff was to pay a portion of her settlement proceeds as attorneys' fees, matching the contingent fee she had originally agreed to. When the settlement judge read aloud what he thought were the terms of settlement, the plaintiff's lawyers

---

[11] "[S]hort-term suspensions with automatic reinstatement are not an effective means of protecting the public. If a lawyer's misconduct is serious enough to warrant a suspension from practice, the lawyer should not be reinstated until rehabilitation can be established. While it may be possible in some cases to show rehabilitation in less than six months, it is preferable to suspend a lawyer for at least six months in order to ensure effective demonstration of rehabilitation." Standard 2.3, cmt. We impose no more than a six-month suspension because to do so under the present circumstances would be unduly harsh. *See supra* ¶ 46. Although under Rule 71(h) Respondents will not be required to prove rehabilitation prior to being reinstated, the Commission may choose to oppose reinstatement. *See* Rule 71(c). There is no need to prove rehabilitation in this case. Respondents will have learned their lesson. We are less concerned with rehabilitation in this case and more concerned with deterring others and maintaining the integrity of the profession.

made no mention of their new fee agreement. We held that, instead of remaining silent, the plaintiff's lawyers "should have either disclosed the complete arrangement or politely declined any discussion of fees." *Fee*, 182 Ariz. at 601, 898 P.2d at 979. The court ultimately imposed only a censure.

¶50    There are, however, crucial distinctions between *Fee* and the present case. First, in *Fee* we concluded that Fee's conduct was prejudicial to the administration of justice but decided not to pursue the issue pertaining to ER 8.4. *Id.* at 600, 898 P.2d at 978. By contrast, such conduct goes to the heart of the present case. Second, the *Fee* court specifically noted an absence of actual or potential injury to a party. *Id.* n.10. Here, unlike *Fee*, Respondents have caused both actual and potential injuries through their conduct, and these substantial injuries extend to the system, the jurors, the witnesses, their client, and perhaps even to the Hospital. To a large extent the damage was not only foreseeable but certain to occur, at least with respect to the waste of time for judge, jury, and witnesses. The failure to disclose in *Fee* related to the contractual arrangements between the lawyers and their client, not to the lawyers' conduct in the courtroom. Finally, unlike Respondents, the *Fee* attorneys never made an affirmative misrepresentation to the judge. These distinctions do not excuse the intentional omission in *Fee* — they simply highlight the magnitude of Respondents' affirmative misconduct. Even if Respondents had been correct in concluding in the first place that there was no duty to disclose the sham nature of the trial, that would not have justified affirmatively misleading the judge when he tried to find out what was occurring. We simply cannot condone affirmative acts that misled the court, nor can we overlook the substantial damage that resulted.

¶51    Accordingly, Respondents are hereby suspended from the practice of law in Arizona for a period of six months beginning sixty days from the date this opinion is filed. Respondents are ordered to pay costs pursuant to Rule 52(a)(8).

_____
STANLEY G. FELDMAN, Justice

25

CONCURRING:

_____
THOMAS A. ZLAKET, Chief Justice


_____
CHARLES E. JONES, Vice Chief Justice


_____
FREDERICK J. MARTONE, Justice


_____
RUTH V. McGREGOR, Justice